STATE of Missouri, Respondent,

v.

Brian WARREN, Appellant.

No. ED 82306.

Missouri Court of Appeals, Eastern District, Division Three.

Aug. 24, 2004.

*ORDER*

Gwenda R. Robinson, St. Louis, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Jefferson City, MO, for respondent.

Before MARY R. RUSSELL, P.J., WILLIAM H. CRANDALL JR., J., and CLIFFORD H. AHRENS, J.

PER CURIAM.

Brian Warren ("defendant") appeals from the judgment entered after a jury convicted him of three counts of murder in the first degree (Count I, Count III, and Count V) in violation of section 565.020 RSMo 2000[1] and three counts of armed criminal action (Count II, Count IV, and Count VI) in violation of section 571.015.

Defendant was charged as a prior and persistent offender acting in concert with Torin Dyson ("Torin") in committing the murders of and armed criminal action against Herbert Robinson ("Herbert"), Dirk Austell ("Dirk"), and Helena Murphy ("Helena").[2] After a jury trial, defendant was convicted on all counts and sentenced as a prior and persistent offender to three terms of life imprisonment without parole for Counts I, III, V, and three terms of life imprisonment for Counts II, IV, and VI. We affirm in part and remand in part.

Viewed in the light most favorable to the verdict, the evidence shows the following. Late in the evening of March 14, 2001, Glenn Robinson ("Glenn") went to visit his cousin, Herbert, in the latter's apartment. Herbert, a drug-dealer, lived on the ground floor of a two-family flat in the City of St. Louis with his girlfriend, Ronetta Simmons ("Ronetta") and her three children. Glenn lived in the apartment on the second story of the same two-family flat with his girlfriend and children. Glenn fell asleep while watching television waiting for Herbert. Glenn briefly woke up and noted that Herbert was in the room, but returned to sleep.

In the early hours of the morning of March 15, 2001, Glenn awoke to the sound of the front door being loudly opened, and saw Herbert fall on the floor, grappling with a man, later identified as Torin, atop him, striving for control of a gun. Glenn went to aid Herbert and observed another man with a gun in his hand, defendant, standing in the doorway, who told him to get back into Herbert's living room. Herbert continued to grapple with Torin on the floor. Glenn tried to enter the hallway again and was warned by defendant to get

---

1. All further statutory citations are to RSMo 2000 unless noted otherwise.

2. To avoid confusion, we use the first names of individuals in this opinion. We intend no disrespect to these individuals.

back or he would be killed. Glenn tried to enter the hallway a third time when he heard Ronetta screaming, and again defendant told him to retreat or he would kill him. Glenn again retreated, but reentered the hallway when Ronetta continued to scream, and told her to get back in the room. Defendant pointed the gun at Glenn's head and told him not to stick his head out again or he would kill him.

Glenn again went back into the living room. He heard Torin ask defendant for help, telling him to shoot Herbert, to which defendant replied "I can't. You in the way." Glenn then observed defendant approach Herbert and strike him repeatedly on the head. Glenn tried to enter the hallway a fifth time, but defendant turned, pointed the gun at him, and told him to get back. Glenn complied, retreating as far back in the living room as he could. He heard a shot, whereupon he ducked behind the couch, looked up and saw Herbert fall back, heard a number of shots and ducked back down. After a while, Glenn emerged from his hiding place and saw the Herbert bleeding from his wounds. He noticed the gun over which Herbert and Torin had struggled in the hallway, picked it up and noted that it had no clip. Glenn spoke with the police after they arrived, and subsequently identified defendant and Torin in line-ups. Police recovered twelve bullet casings from the scene, a number of bullets from the body of Herbert, and a fingerprint from the front door handle. Neither the bullets nor the casings came from the gun found by Glenn. An autopsy showed that Herbert had been shot twelve times, once in the chest, once in the hip, once in the perineum, and nine times in his right thigh. The police laboratory determined

that the seven bullets recovered from Herbert's body all came from the same gun, and also that all of the shell casings came from the same gun.[3]

Several weeks after Herbert's murder, on April 1, 2001, Helana and her three children returned to their home in the City of St. Louis which they shared with Helena's boyfriend, Dirk, a drug-dealer, after an evening that Helena and her children had spent with her family. Dirk was not home at that time. Helena spoke with her sister between 10:30 p.m. and 10:45 p.m. Aigner Murphy ("Aigner"), Helena's oldest daughter, fell asleep in her mother's bedroom, and was awakened by a stranger. The stranger and another person sent her to her brother's room, and later brought her baby sister there as well. Aigner heard the strangers, defendant and Torin, talking about money, with one saying that he knew there was over a thousand dollars there. Aigner fell asleep, but woke up when she heard the door open and Dirk's voice, and yelling and crying. The stranger who had carried her baby sister into the room came back and removed the Sony PlayStation and some games. Subsequently Aigner heard gunshots, but went back to sleep.

In the morning, Aigner found the bodies of Helena and Dirk, and called her grandmother, who told her to call the police. The police found the bodies face down, their heads covered with pillows with bullet holes in them. They recovered several shell casings and a live bullet from the living room. The police discovered that the house had been roughly searched and was in disarray. Autopsies showed that both Helena and Dirk had been shot several times. A bullet was recovered from Helena's hand, and several bullet frag-

---

**3.** Without the gun to test fire, it is impossible to determine if a casing and a bullet came from the same gun, even though it is possible to tell if multiple bullets came from the same gun, or that multiple casings came from a single gun.

ments were recovered from Dirk's body. Tests determined that the casings recovered at Helena's residence were all fired from the same gun. Tests also showed that the gun used to fire these shell casings also fired the shell casings found at Herbert's home. Further, tests showed that bullet recovered from Helena's hand had been fired by the same gun that fired the bullets recovered from Herbert's body.

At trial, Ronetta testified that she was living with Herbert on March 15, 2001, and that he made his living as a drug-dealer. She stated that she went to sleep early that evening, and woke up when she heard arguing. She stepped into the hallway and saw two men whom she could not identify and Herbert. She said from her vantage she could see Glenn standing in the living room doorway. Ronetta stated that she fled through the back door and down the alley to her nearby cousin's house when one man pointed a gun at her. She testified that while at her cousin's house she heard "a lot" of gunshots. She returned to her home after the police arrived, sometime near 3:00 a.m.

Glenn testified to the events as previously set forth. He stated that he viewed a lineup for the police on April 12, 2001, and that no one influenced him when he viewed the lineup. Looking at a photo of the lineup that he saw, Glenn stated that he identified Torin at the lineup on April 12, 2001, as the man who grappled with Herbert on the night of March 15, 2001. Glenn further testified that he looked at a different lineup on August 10, 2001, and that he was able to make an identification at that lineup as well. He stated that the man he identified at that lineup was the man with the gun in the doorway. Glenn examined a photo of the lineup, and said that it accurately reflected the lineup that he viewed on August 10, 2001. Glenn then made an in-court identification of defen-

dant as the man who pointed the gun at him on the night of March 15, 2001.

Officer George Ratermann ("Officer Ratermann"), a police evidence technician, testified concerning the evidence that he gathered and preserved at the crime scene on the morning of March 15, 2001. He stated that he collected twelve shell casings and one live round at the scene, which he packaged for evidence. He also testified that he was able to take a latent fingerprint and a relift fingerprint from the outside of the storm door of Herbert's home, which he also marked and preserved for later identification.

Officer Raymond Oberschlep ("Officer Oberschlep"), a latent fingerprint examiner for the police, testified that the fingerprints collected by Officer Ratermann from the crime scene on March 15, 2001 matched the lift index fingerprint of defendant in a side-by-side comparison. Officer Oberschlep stated that he had no doubt in his mind that the fingerprints matched, and that no two people have the same fingerprints. Officer Oberschlep discussed the standard fingerprint identification procedures used, which included having his identification of the fingerprints re-examined by another qualified latent fingerprint examiner. This other examiner confirmed the match between the samples taken by Officer Ratermann and the print of defendant's left index finger.

Officer Dennis Conway ("Officer Conway"), who works in the firearms and tool mark identification section of the police laboratory, testified that the dozen shell casings recovered from the March 15, 2001 crime scene all came from the same gun, which was not the gun found by Glenn. Officer Conway also stated that the expended bullets, and the identifiable fragments recovered from Herbert's body came from the same weapon, which was not the gun found by Glenn. Officer Con-

way said that his work and expert opinion was checked by Frank Stubits ("Stubits"), who agreed with his conclusions.

Randi Cohns ("Randi") testified that she knew defendant, Torin, and Herbert, having bought drugs from Herbert. She stated that in the evening of March 14, 2001, defendant asked her to take him to Herbert's home to purchase drugs. She could not do so at that time. Randi said that later, in the early hours of the morning on March 15, 2001, defendant called her and asked her to meet him at Tower Grove Park. She stated that she drove by Herbert's home on her way to meet defendant and observed that many police were there. Randi testified that she met defendant and Torin at the park, and told defendant what she had seen on her way there. She stated that she then asked defendant what had happened. She averred that he told her that he and Torin had gone to Herbert's home and asked to purchase some drugs, and that during the deal he had pulled a gun on Herbert. Randi stated that defendant also told her that Herbert and Torin somehow started to fight, and that he had shot Herbert after seeing them struggle over a gun. She said that he also told her that there had been a man in the living room during the struggle, as well as woman in the kitchen armed with a weapon. She averred that defendant had said that he did not expect that Herbert would fight, and he asked her to go back over to Herbert's house to see what was happening.

Regarding the murders of Helana and Dirk, Officer Richard Booker, Jr. ("Officer Booker"), assigned to the evidence technician unit of the police, testified about the crime scene, and what was done to preserve and recover evidence. He stated that six shells and one live round were recovered at the scene, which were preserved and marked as evidence. Officer Booker said that the house was in disarray, with a number of objects overturned, including the washer and dryer, with insulation ripped from the basement ceiling.

Dr. Jane Turner ("Dr. Turner"), an assistant medical examiner for the City of St. Louis, testified that she performed the autopsies on Herbert, Helena, and Dirk. She stated she recovered bullets and fragments of bullets from the respective bodies, which were preserved and marked as evidence. Dr. Turner stated that Herbert had lacerations of the head along with bruising and swelling consistent with blunt force injury.

Stubits, a retired City of St. Louis police officer working as a firearm and tool mark examiner for the crime laboratory of the City of St. Louis Police Department, also testified. Stubits stated that he examined the shell casings recovered from the April 2, 2001 crime scene, and determined that they were all fired from the same gun. He also compared those shell casings to those recovered from the March 15, 2001 crime scene, and concluded that all of the shell casings from both crime scenes had been fired by the same weapon. Stubits stated that he compared the bullet recovered from Helena's hand with the bullets recovered from Herbert's body. He averred that there were sufficient striations on two of the bullets recovered from Herbert's body that he could positively state that they were fired from the same gun as that which fired the bullet recovered from Helena's hand. Stubits stated that the results of comparing the bullet from Helena with the others from Herbert's body were "inconclusive," which meant that while the specimens were consistent as to "caliber, the number of six lands and grooves, the rifling[,]" there were not sufficient markings on the other bullets recovered from Herbert's body to permit him as a firearms expert to state that they were positive matches.

Aqueelah Beyah ("Aqueelah") testified that in March and April 2001 she was the girlfriend of Torin, and that she knew defendant as well, whom she identified in the courtroom. She stated that she knew Dirk through Torin, and knew that Dirk sold heroin. Aqueelah testified that sometime prior to April 2, 2001, Torin told her that he was going to rob Dirk, literally that he was "going to do a lick" and kill him because Dirk would not supply him with drugs when Torin did not have sufficient money.

Aqueelah testified that she saw defendant and Torin at her apartment after April 2, 2001. She stated that she left with Torin to buy heroin, and she asked him what happened with Dirk. She averred that Torin replied, "You know what I did." She stated that after they returned to her apartment, Torin left, but defendant remained. She said that defendant had a duffle bag with him. Aqueelah stated that she looked into the duffle bag and saw that it contained two guns, "Play Station cartridges and stuff like that[,]" a video camera, and some videotapes. She testified that defendant "had a nice little amount" of money with him when he was at her apartment, and that he continued to stay at her home for approximately two weeks thereafter. Aqueelah stated that defendant told her that he and Torin had put pillows over the heads of Dirk and Helena and killed them, and that Helena had been wearing nightclothes. She also said that defendant asked her to dispose of the duffle bag.

Several other witnesses testified. A number of exhibits were introduced into evidence including tapes of Aqueelah's interviews with the police, numerous photographs, documents, and physical evidence. The State of Missouri ("State") and defendant stipulated that defendant had pleaded guilty to three 1998 charges of tampering in the first degree, all of which occurred at the same time. The trial court orally found defendant to be a prior offender.

Defendant was convicted and sentenced as a prior and persistent offender to three terms of life imprisonment without the possibility of parole for the murder convictions and three terms of life imprisonment for the armed criminal action convictions. Defendant now appeals from this judgment.

In his first point on appeal defendant asserts that the trial court erred by abusing its discretion in overruling his motion for the severance of Counts I and II from Counts III through VI because the counts were improperly joined in the indictment and the refusal to sever the counts prejudiced him, thereby denying him his right to due process of law under the U.S. Constitution and the Missouri Constitution.

Joinder and severance are separate and distinct issues for appellate review. *State v. Spencer*, 50 S.W.3d 869, 879 (Mo.App.2001). Joinder deals with the issue of what crimes can be charged in a single proceeding, while severance assumes that joinder is proper and leaves to the discretion of the trial court the determination of whether prejudice may result if charges properly joined were tried together. Section 545.140.2; Rule 24.07; *State v. Smith*, 886 S.W.2d 194, 196 (Mo. App.1994).

The issue of whether joinder is proper is a question of law, and this Court only examines the State's evidence in making this determination. *State v. Bechhold*, 65 S.W.3d 591, 595 (Mo.App.2002). Under Rule 23.05, joinder of offenses is proper where the manner in which the crimes were committed

are of the same or similar character or based on two or more acts that are part

of the same transaction or on two or more acts or transactions that are connected or that constitute parts of a common scheme or plan....

*See also* Section 545.140.2. Joinder is proper if any one of the criteria in the statute exists. *Bechhold,* 65 S.W.3d at 595.

Defendant argues that although Counts I through VI consisted of first degree murder and armed criminal action charges, the acts charged were neither of a same or similar character, nor were they part of the same transaction, common scheme, or plan. Defendant contends that the acts in Counts I and II differed from the acts in the remaining counts in: the victims' identities; location and date; the degree to which they were planned; motive; location of the victims' fatal wounds; the manner in which the fatal wounds occurred; the state in which the police found the crime scenes; the identity of witnesses; the number of witnesses testifying to their presence at the crime scenes, before or during the acts; and the amount and type of evidence identifying defendant as having committed the acts.

■■ The tactics used in the commission of the crimes do not need to be identical; similar tactics are enough to constitute acts of "same or similar character." *Smith,* 886 S.W.2d at 197. Nonexclusive factors that this Court examines that can prove that a person used similar tactics include the commission of the same type of offenses, victims of the same sex and age group, offenses occurring at the same location, or offenses closely related in time. *State v. Hyman,* 37 S.W.3d 384, 393 (Mo. App.2001).

In both cases, the State proved that defendant robbed a drug-dealer at his home in the early hours of the morning, and thereafter killed the drug-dealer, all in concert with Torin, using the same weapon to fatally shoot all of the victims. This is sufficient evidence of similar tactics to make joinder proper. We need not find that there was a common plan or scheme with respect to the joinder of these counts because joinder is proper if any one of the criteria in the joinder statute exists. *Bechhold,* 65 S.W.3d at 595.

■ Having determined that joinder was proper in this case, we examine the issue of severance. Severance assumes that joinder was proper, and leaves to the trial court's discretion the determination of whether or not prejudice may or would result if the properly joined charges were tried together. Section 545.140.2; Rule 24.07. Rule 24.07 states that an offense shall be ordered to be tried separately only if:

a) A party files a written motion requesting a separate trial of the offense;

b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and

c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.

Severance is proper only when the defendant shows that he or she will suffer substantial prejudice if the offenses are not tried separately and the trial court finds the existence of bias or discrimination requiring separate trials of the offenses. *Bechhold,* 65 S.W.3d at 596 (quoting *State v. Morrow,* 968 S.W.2d 100, 109 (Mo. banc 1998)). Severance is a matter left to the discretion of the trial court. *Id.* There is no abuse of discretion in a trial court's denial of a motion to sever if the motion does not state sufficient facts demonstrating a particularized showing of substantial prejudice as required by both section 545.885.2 and Rule 24.07(b). *Bechhold,* 65

S.W.3d at 596 (quoting *State v. Kelley,* 953 S.W.2d 73, 81 (Mo.App.1997)).

Defendant argues that he was charged by the State in a single indictment with shooting and killing three separate victims at two different times and geographical locations. He contends that the State's evidence of his guilt on Counts I and II was different from its evidence of his guilt on Counts III through VI save for one common witness, Dr. Turner, and expert testimony which established that the same gun was used in both crimes. Defendant asserts that the State's evidence which identified him as a perpetrator was much stronger for Counts I and II than for Counts III through VI. Defendant argues that in light of this evidence, the trial court's overruling of his motion to sever was doubly prejudicial because it presented the danger that the jury would use evidence of three murders as evidence of his propensity to commit murder and find him guilty on less than proof beyond a reasonable doubt for each count, and that the jury would used guilt on Counts I and II to infer guilt on the remaining counts for which evidence of his guilt "was so lacking as to be arguably insufficient for conviction."

Defendant filed a written motion for severance, but it did not make a particularized showing that he would be substantially prejudiced if the offenses were not tried separately or that there was evidence of a bias or discrimination against him that required severance. Defendant's First Amended Motion for Severance asserted that he might testify on one charge but not the other and that he might have an alibi for one charge, but not the other. He also argued that he was identified by Glenn as a perpetrator of the March 15, 2001 incident, but not the April 2, 2001 incident, which would create a substantial likelihood that he would be convicted for both inci-

dents based on Glenn's identification. In a similar vein, defendant contended that Aqueelah made statements implicating him in the April 2, 2001 incident, but made no statement regarding the March 15, 2001 crimes, and that there was a substantial likelihood that he would be convicted for both incidents based on the statement of Aqueelah regarding the April 2nd incident where there was no evidence incriminating him in the March 15th crimes.

■■■■■ A number of Missouri cases indicate that defendant has not made a sufficient particularized showing of substantial prejudice in his motion. *See Bechhold,* 65 S.W.3d 591; *State v. Kelley,* 953 S.W.2d 73 (Mo.App.1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *State v. Hobbs,* 826 S.W.2d 851 (Mo.App.1992); *State v. Morant,* 758 S.W.2d 110 (Mo.App.1988); *State v. Harris,* 705 S.W.2d 544 (Mo.App.1986). In *Bechhold,* the defendant, in addition to general allegations concerning the ends of justice and violations of his constitutional rights, also argued in his motion to sever that joinder of the offenses would result in substantial prejudice to him "because the jury would likely consider evidence of guilt on one charge as evidence of guilt on another charge." The defendant in that case also asserted that he might wish to testify on one charge but not the other. The appellate court held that "[t]he general allegation of resulting substantial prejudice does not present a basis for finding a denial of the motion to be an abuse of discretion." *Bechhold,* 65 S.W.3d at 596. The mere fact that juries are disposed to regard with a more jaundiced eye a person charged with two crimes than a person charged with one does not call for severance. *Id.* (quoting *State v. Spencer,* 50 S.W.3d 869, 879 (Mo.App.2001)). "The general allegation that the jury would likely consider evidence of guilt on one charge

as evidence of guilt on another charge does not meet the requirement of a particularized showing of substantial prejudice." *Bechhold*, 65 S.W.3d at 596–97. The appellate court in *Bechhold* also held that the defendant's motion did not present a cause for severance "by reason of the general allegation that Defendant may wish to testify on one charge, but not the other." *Id.* at 597. *See State v. Seagraves*, 700 S.W.2d 95, 99 (Mo.App.1985). The appellate court further held that the defendant's general allegation that he might wish to testify on one charge, but not the other, did not meet "the mandatory standards of Rule 24.07 by pleading a particularized showing of substantial prejudice." *Bechhold*, 65 S.W.3d at 597. A general allegation that a defendant might have an alibi for one charge, but not the other has also been held insufficient to establish prejudice. *See Morant*, 758 S.W.2d at 116; *Harris*, 705 S.W.2d at 550–51.

▆▆▆▆ Defendant in the case before this Court has not pleaded a particularized showing of substantial prejudice resulting from the offenses being tried jointly. In addition, in determining whether or not prejudice may result, the trial court should consider, among other things, the number of offenses charged, the complexity of the evidence to be presented, and whether the jury is able to realistically distinguish the evidence and apply the law intelligently to each offense. *State v. Vinson*, 834 S.W.2d 824, 827 (Mo.App.1992). Defendant seems to focus on the last element of *Vinson*, that is, whether the jury can realistically distinguish the evidence and apply the law intelligently to each offense. Where the evidence relating to each offense is uncomplicated and distinct, and the jury is properly instructed to return separate verdicts for each offense charged, there is no abuse of discretion in refusing to sever the counts. *State v. Tripp*, 939 S.W.2d 513,

519 (Mo.App.1997). The evidence relating to the separate offenses committed on March 15, 2001 and April 2, 2001 is distinct and not complicated. The instructions and verdict directors made it clear that each offense was distinct, and the jury was specifically instructed that each count had to be considered separately. Nothing in the record before this Court indicates that the trial court should have believed that the jury could not realistically distinguish between the evidence offered regarding each set of offenses and apply such evidence to the relevant offense. The trial court did not abuse its discretion in denying defendant's motion to sever. Point denied.

▆▆▆▆ In his second point on appeal, defendant contends that the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence because the evidence was insufficient to support his convictions on Counts III and V for murder in the first degree and Counts IV and VI for armed criminal action. Defendant further states that there was insufficient substantial direct or circumstantial proof, independent of his admission to Aqueelah, that proved his involvement in deaths of Dirk and Helena beyond a reasonable doubt, or that he acted together with Torin, after deliberation, in killing Dirk and Helena. Defendant further avers that the State did not introduce "sufficient corroborative evidence" to establish the deaths of Dirk and Helena occurred and that his admission to Aqueelah was trustworthy.

In reviewing a claim that the evidence was insufficient, we determine whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003). In applying this standard, we view the evidence in the light

most favorable to the State and grant the State all reasonable inferences from the evidence, disregarding all contrary evidence and inferences. *State v. Rollen*, 133 S.W.3d 57, 61 (Mo.App.2003). We do not weigh the evidence. *Id.* The trier of fact determines the credibility of the witnesses, and may believe all, some or none of the testimony of a witness. *Id.* Review is limited to a determination of whether there is sufficient evidence from which a reasonable finder of fact could find the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993).

Extrajudicial confessions, statements, or admissions by the accused generally are not admissible unless they are corroborated by independent evidence, either direct or circumstantial, showing the *corpus delicti* of the crime. *State v. Edwards*, 116 S.W.3d 511, 544 (Mo. banc 2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). It is the State's burden to establish the *corpus delicti*. *Id.* It cannot be presumed and must be proved by legal evidence sufficient to show that the crime charged actually has been committed by someone. *Id.* However, full proof of the *corpus delicti* independent of the defendant's extrajudicial confession, admission, or statement is not required. *State v. Garrett*, 829 S.W.2d 622, 626 (Mo.App.1992). On the contrary, "[o]nly 'slight corroborating facts' are needed." *Edwards*, 116 S.W.3d at 544–45 (quoting *State v. McQuinn*, 361 Mo. 631, 235 S.W.2d 396, 397 (Mo.1951)). The corroborating evidence may be circumstantial, and if so, the circumstances and facts establishing guilt must be consistent with each other and consistent with the hypothesis of guilt. *State v. Fears*, 803 S.W.2d 605, 608 (Mo. banc 1991). However, these circumstances do not need to be absolutely

conclusive of guilt or demonstrate the impossibility of innocence, and the mere existence of other possible hypotheses is not sufficient to remove the case from the jury. *Edwards*, 116 S.W.3d at 544 (quoting *Fears*, 803 S.W.2d at 608). In addition, if a confession is made which permits the State to discover corroborating evidence of the particular crime confessed, the corroborating evidence does not need to be sufficient, independent of the confession, to establish complete proof that the crime has been committed. *State v. Goodwin*, 352 S.W.2d 614, 621 (Mo.1962), *cert. denied*, 371 U.S. 915, 83 S.Ct. 262, 9 L.Ed.2d 174 (1962); *Garrett*, 829 S.W.2d at 626. *See also McQuinn*, 361 Mo. at 633, 235 S.W.2d at 397. The *corpus delicti* in a homicide case consists of proof of the death of the victim and evidence that the criminal agency of someone other than the victim caused the death. *Edwards*, 116 S.W.3d at 544.

There is ample evidence to corroborate the statement made to Aqueelah. It is clear from the record that Dirk and Helena did not die by accident or that they served as the cause of their own deaths. They were murdered. The same gun was used in both the Dirk–Helena murders as in the murder of Herbert, which gun was not recovered. Aqueelah stated that she saw two guns in the duffle bag that defendant asked her to dispose of. Helena was wearing nightclothes, and pillows with bullet holes were found on or by the heads of Helena and Dirk, which matches defendant's statements to Aqueelah. Aqueelah saw Play Station game cartridges in defendant's duffle bag. Play Station game cartridges were taken from Helena's house according to Aigner. There was sufficient evidence both to establish the *corpus delicti* and to support defendant's conviction. Point denied.

In his third point on appeal, defendant argues that the trial court erred by abusing its discretion by admitting Aqueelah's statement that Torin told her that he planned to rob and kill Dirk because it was inadmissible hearsay. Defendant further contends that this statement was inadmissible hearsay because there was no evidence that it was made in furtherance of a conspiracy to murder Dirk and Helena, and that it was offered to prove that defendant acted together with Torin and deliberated on killing them. Defendant also asserts that the admission of the statement prejudiced him "by implicitly inculpating him in the charged offenses" for the murders of Dirk and Helena, and could not challenge the implicit accusation through confrontation or cross-examination, thereby denying him the right to due process of law, the right to confrontation and cross-examination, and the right to a fair trial.

Statements of a conspirator are admissible against another conspirator under the co-conspirator exception to the hearsay rule, even if a conspiracy has not been charged. *State v. Ferguson*, 20 S.W.3d 485, 496 (Mo. banc 2000), *cert. denied*, 531 U.S. 1019, 121 S.Ct. 582, 148 L.Ed.2d 499 (2000). The existence of a conspiracy may be established by circumstantial evidence which consists of the mere appearance of "acting in concert." *Id.* In order for a statement to be admissible under this exception, there must be a showing, by evidence independent of the statement, of the existence of the conspiracy. *Id.* In addition, the statement must have been made to further the conspiracy. *Id.* However, the conspirator need not be present when such a statement is made by a co-conspirator for it to be admissible under this exception. *State v. Cornman*, 695 S.W.2d 443, 446 (Mo. banc 1985). But if the statement by a co-conspirator is not made in furtherance of the conspiracy, or if it was made prior to the formation of the conspiracy or after the consummation of its purpose, it is hearsay and inadmissible as to the co-conspirator. *State v. Chernick*, 278 S.W.2d 741, 748 (Mo.1955); *State v. Johnson*, 714 S.W.2d 886, 890 (Mo.App. 1986).

The State does not dispute that there is no evidence that a conspiracy between defendant and Torin existed when the latter made the statement to Aqueelah, and nothing in the record shows how this statement would have been in furtherance of a conspiracy to kill Dirk. Accordingly, Torin's statement to Aqueelah that he planned to rob and kill Dirk is inadmissible hearsay. However, in matters concerning the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Anderson*, 76 S.W.3d 275, 277 (Mo. banc 2002); *State v. Hayes*, 113 S.W.3d 222, 226 (Mo.App.2003). Lacking some showing that the evidence inflamed the jury or diverted its attention from the issues to be resolved, the receipt of evidence, even though immaterial and irrelevant, cannot constitute prejudicial or reversible error. *Hayes*, 113 S.W.3d at 226. "The test for the admission of evidence is whether the prejudicial improper admission was outcome-determinative." *Id.* There is a distinction between evidence-specific and outcome-determinative prejudice. *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000). A finding of outcome-determinative prejudice expresses the judicial determination that the improperly admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the improperly ad-

mitted evidence. *Id.; Hayes,* 113 S.W.3d at 226.

Torin's statement to Aqueelah made no reference to defendant. Instead he indicated that he was going to rob and kill Dirk, with no reference to anyone else aiding him in this endeavor. Unlike the statements in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) to which defendant cites, the statement at issue in this case does not directly inculpate defendant. Torin's statement does not make reference to anyone other than himself, not even to "someone" or "an individual." [4]

Defendant asserts that the jury relied on Torin's statement that he planned to rob and kill Dirk to infer that defendant planned to kill Dirk and Helena. However, the evidence shows that defendant and Torin were present in Helena's home for some time waiting for Dirk to return. It also shows that pillows were placed over the heads of Dirk and Helena before they were shot, and that both were shot through the pillows. This is sufficient for the jury to have found deliberation on the part of defendant independent of any implication from Torin's statement to Aqueelah. Defendant did not suffer outcome-determinative prejudice from the errone-

ous admission of Torin's hearsay statement. Point denied.

In his fourth point on appeal, defendant argues that the trial court committed plain error resulting in manifest injustice in entering its written sentence and judgment finding him to be a persistent felony offender under section 558.016 after orally pronouncing him to be a prior felony offender. Defendant further asserts that this Court should reverse and remand with the error to be corrected by judgment *nunc pro tunc.*

Defendant admits that he failed to preserve this allegation of error, and requests plain error review. In its brief, the State notes that defendant was charged as a prior and persistent offender, but admits that evidence was present only as to the 1998 charges of tampering in the first degree against defendant and his plea of guilty. Defendant and the State stipulated outside of the presence of the jury that he had pleaded guilty to the three 1998 felonies which occurred at the same time. The State observes that the trial court found defendant to be a prior offender, but notes that the sentence and judgment shows marks in the prior offender box and in the persistent offender box. In view of this, the State does not dispute that the sentence and judgment is incorrect and requests that we remand this issue to the trial court for the purpose of correcting

---

4. Defendant cites to *United States v. Donahue,* 948 F.2d 438, 443, n. 4 (8th Cir.1991) for the proposition that intolerable prejudice to a defendant can occur when the statement of a co-defendant or co-conspirator does not explicitly accuse the defendant, "but implicitly leads the jury to the conclusion [that] the defendant was an accomplice." The court in *Donahue* in fact found that the statement, which contained references to "everyone" and "they" and did not expressly implicate the defendant in that case nor did the testimony incriminate

him on its fact, and held that there was no improper linkage between the testimony and the defendant, "nor was there an impermissible invitation to speculate." *Id.* at 444. Footnote 4 observes that the Supreme Court did not express an opinion about the use of neutral pronouns in confessions from a non-testifying codefendant, and further notes that the 8th Circuit Court of Appeals has decided the issue on a case-by-case basis, as has other federal circuit courts. *Id.* n. 4.

the judgment and sentence. We agree. Point sustained.

The judgment of the trial court is affirmed in part and remanded in part, with instructions to the trial court to enter judgment *nunc pro tunc* in accordance with this opinion.