STATE of Missouri, Appellant,

v.

Curtis STEWART, Respondent.

Curtis STEWART, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 61051, 62695.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 3, 1993.

Jeannie Arterburn, S. Paige Canfield, Loyce Hamilton, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Curtis Stewart, appeals his jury conviction for murder in the first degree, RSMo § 565.020 (1986), two counts of armed criminal action, RSMo § 571.015 (1986), and felony assault, RSMo § 565.050 (1986), in the Circuit Court of the City of St. Louis. Appellant was sentenced to life imprisonment without parole on the first degree murder conviction, fifty years' imprisonment on each count of armed criminal action, and fifteen years' imprisonment on the felony assault count. Appellant also appeals the denial of his postconviction relief motion after an evidentiary hearing.

On September 10, 1990, security officers Robert Stallings and Jerry Sansoucie were patrolling Laclede Town Housing Complex in Sansoucie's private automobile. At 8:45 p.m., as the officers drove past the 3000 block of Lawton, they were ambushed by assailants firing .22 caliber weapons. A total of seventeen bullets fired from two different weapons struck the officers' vehicle. Officer Sansoucie suffered bullet wounds to the head and arm and died the next day. Officer Stallings was injured when the officers' car subsequently crashed into a vacant building.

In the light most favorable to the verdict, the evidence established that two days before the murder, Sansoucie spotted appellant entering Laclede Town riding on his bicycle. Sansoucie alerted other security guards to the fact that appellant was not allowed in Laclede Town, and another security officer arrested appellant. At the time of his arrest, appellant threatened the guards, and specifically threatened Sansoucie.

On the evening of the murder, appellant and Victor Harper went to Kenneth Dotson's apartment looking for Dotson's brother. Unable to locate the brother, appellant and Harper informed Dotson where weapons could be located in the building and instructed Dotson to retrieve them. Dotson complied and followed appellant and Harper to a vacant building where he watched them load the weapons. The three then went to the murder scene, where they positioned themselves in perches in the windows of separate vacant apartments.

Dotson saw shots fired at the officers' car as it passed by and subsequently crashed. He saw Harper fire and heard appellant firing from the next apartment. As appellant and Harper fled, Dotson heard appellant say, "They chased me out of here again, man, this [is] our set." Dotson later saw appellant in the city jail, where appellant pressured him, "I don't know nothing about no weapons or no guns, and you don't know nothing either." Appellant added to the effect, "without guns, they ain't got no evidence no way."

On the day of the murder, Robert Rice, who had known appellant for several years, was in Laclede Town visiting his girlfriend. Three or four hours before the murder, Rice observed Sansoucie and other security guards chasing appellant and appellant's codefendant, Victor Harper. Rice heard appellant proclaim he was "tired of him" and that he was "going to get him." That evening, after hearing numerous gunshots, Rice observed appellant and Harper carrying rifles. Thirty minutes later, Rice saw appellant, Harper, and appellant's brother, Michael Stewart, riding in appellant's mother's car. Rice informed appellant that police were looking for appellant and Harper. The occupants of the car just smiled and laughed.

Chris Harper, brother of Victor Harper, admitted to police that on the day of the murder, he went to K–Mart with appellant to buy bullets. According to K–Mart's records, the type of bullets Harper claimed they had bought were in fact, purchased at K–Mart at the time in question. However, at trial, Chris Harper changed his story, claiming he had just made this up. During his testimony, Chris Harper also admitted telling police that appellant and Victor Harper were at the shooting scene with rifles at the time of the murder. Harper claimed he had also fabricated this fact. Between the time of his admissions to police and his testimony at trial, Chris Harper was incarcerated in the same facility as appellant. Harper saw appellant at the facility, though he claimed he never spoke to him. During the same period, Chris spoke to members of his family concerning appellant's trial.

The defense presented Anthony Cooper as a witness. Cooper claimed he was with appellant at Blumeyer Housing Complex in a different part of town on September 10, 1990. Cooper asserted that appellant remained with him until appellant's brother came to pick him up.

For his part, appellant testified that he was at Laclede Town earlier in the day, but that he left for Blumeyer where he saw his girlfriend and Anthony Cooper. Appellant claimed he then left Blumeyer and flagged down his brother who was driving by. Appellant asserted the two of them went to Barnes Hospital to visit a friend, and then to Victor Harper's girlfriend's house. He professed Victor came by thirty minutes later and started talking about how a security guard had been shot. Later, he maintained, his brother took him "straight home."

A jury found appellant guilty on all charges. On October 25, 1991, the Honorable Charles D. Kitchin sentenced appellant to consecutive terms of life without parole plus 115 years.

On May 11, 1992, appellant filed a pro se Rule 29.15 motion in the Circuit Court of the City of St. Louis. Upon appointment of counsel, an amended Rule 29.15 motion was filed on July 9, 1992. On August 11, 1992, Judge Kitchin denied appellant's motion after an evidentiary hearing. This consoli-

dated appeal followed.[1]

Appellant's first contention on appeal is that the trial court erred in failing to strike an unqualified venireperson for cause. Because of this, appellant contends he was forced to use a peremptory strike to remove the venireperson. Appellant claims that Stephen Welby, a venireperson, had recently graduated from law school, and was to be sworn in as a licensed attorney within one week. According to appellant, then, but for a "mere technicality," Welby was a licensed attorney. We disagree.

We note that a defendant is entitled to a full panel of qualified jurors before he makes peremptory challenges. *State v. Ervin*, 835 S.W.2d 905, 915 (Mo. banc 1992). Even if an unqualified juror does not actually serve, it is prejudicial error to fail to sustain a meritorious challenge for cause. *Id.* However, the trial court has broad discretion in determining the qualifications of prospective jurors and its ruling will not be disturbed unless it is clearly erroneous. *Id.*

According to Missouri statute, several classes of persons may not sit as jurors:

> The following persons shall be disqualified from serving as a petit or grand juror:
>
> *   *   *   *   *   *
>
> (7) Any licensed attorney at law ...

RSMo § 494.425 (1989).

Venireperson Welby clearly did not fit within the proscriptions of the statute. Had the legislature meant to disqualify all those who have graduated from law school, it could have done so. The legislature clearly limited disqualification to those attorneys who are licensed, which the venireperson in question was not. The licensing requirement appellant characterizes as a "mere technicality" represents the difference between a person practicing law legally, and a person in criminal violation of Missouri statutes. *See* RSMo § 484.020 (1986); *In re H——— S———*, 236 Mo. App. 1296, 165 S.W.2d 300, 302 (St.L.D. 1942). We see no error on the part of the trial court in following the plain wording of the statute and refusing to strike venireman Welby for cause as a licensed attorney. Point denied.

Next, appellant contends the trial court erred in overruling his motion in limine to exclude evidence of appellant's arrest two days prior to the shooting of Sansoucie. We disagree. As appellant concedes, this issue was not properly preserved for appeal because appellant failed to object to this evidence when it was admitted at trial. We therefore review only for plain error which would result in "manifest injustice." Rule 29.12; *State v. Childers*, 801 S.W.2d 442, 444 (Mo.App., E.D. 1990).

Evidence of a prior arrest is admissible when it tends to establish, 1) motive, 2) intent, 3) absence of mistake or conduct, 4) common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or 5) identity. *State v. Kenley*, 693 S.W.2d 79, 81 (Mo. banc 1985). The testimony appellant complains of was elicited from one of the security guards working with Sansoucie, Sonny Heard. Heard testified Sansoucie alerted him that appellant was not allowed on the premises, and that Heard was to arrest appellant. After Heard apprehended him, appellant said, "You son of a bitches, I'll get you for this." Looking at Sansoucie who was approaching in his car, appellant added, "Especially you. These son of a bitches here would never know who I was if it wasn't for you, and I will get even with you." This testimony was obviously admissible to show appellant's intent and motivation to kill Sansoucie. Because of this, the trial court committed no error regarding the admission of this testimony. Point denied.

Appellant next complains the trial court erred in unreasonably restricting his voir dire examination. We recognize the purpose of voir dire is to provide both parties the opportunity to participate in the selection of a fair and impartial jury.

---

**1.** Further facts will be developed as needed.

*State v. Hudson,* 815 S.W.2d 430, 432 (Mo. App., E.D.1991). The trial court has discretion over the nature and extent of counsel's questioning. *Id.* The Court's discretion in its decisions concerning voir dire will not be disturbed absent manifest abuse of discretion and a real probability of injury to the defendant. *Id.*

In the present case, appellant's counsel desired to question venirepersons concerning their attitudes towards guns. He was permitted to do so, but was prevented from delving into the types of weapons individual venirepersons owned and how long they owned them. The trial court indicated this probing inquiry was too far removed from the determination of the panel's attitudes towards guns in general. We cannot find the trial court abused its discretion in preventing defense counsel from rummaging through matters of such marginal relevance. *See Id.* Point denied.

■ Appellant next contends the motion court erred when it denied him a new trial based on his claim of ineffective assistance of trial counsel. Appellant argues that trial counsel erred in not calling several witnesses who could have exonerated him. The witnesses appellant claims counsel mistakenly excluded were: Takasha Cross,[2] Michael Stewart, Rorie Watkins, Gary Bell and Dee Sykes.

■ Review of a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. *Jones v. State,* 771 S.W.2d 349, 351 (Mo.App., E.D. 1989). A reviewing court must be left with a definite and firm impression that a mistake has been made. *Id.* In addition, defense counsel will only be found ineffective in not calling a witness if the movant proves: 1) the witness could have been unearthed through reasonable investigation; 2) if called, the witness would have testified; and 3) the testimony would have

provided a feasible defense. *Harry v. State,* 800 S.W.2d 111, 115 (Mo.App., E.D. 1990). Defense counsel in a criminal proceeding is given "a heavy measure of deference" when deciding which witnesses are worth pursuing and which are not. *State v. Twenter,* 818 S.W.2d 628, 635 (Mo. banc 1991). We will examine appellant's claims concerning each potential witness.

Appellant claims Takasha Cross would have testified that appellant spent the hours in question with her at her residence. The court found her testimony was unbelievable and only given in hopes of securing a new trial for appellant. We agree.

At the evidentiary hearing, Takasha testified that appellant showed up at her house along with his brother Michael and codefendant, Victor Harper. This was in direct conflict with appellant's own testimony at trial that he arrived at Takasha's house alone. Takasha testified she was not present at anytime during appellant's trial. However, appellant testified at the sentencing hearing that *all* of his requested witnesses were present at trial.

Takasha's explanation as to why she failed to come forward with this case-breaking testimony during trial is also unbelievable. First, Takasha claimed she attempted to contact appellant's counsel, Ms. Caterina DiTraglia, long before trial. Takasha testified that after appellant explained to her who his attorney was, she went to the Civil Courts Building and tried to make an appointment, only to discover appellant's attorney had gone to lunch. Ms. DiTraglia, however, does not work in the Civil Courts Building. Takasha also claimed she did not come forward with this evidence at trial because she just did not have the attorney's phone number.

We agree with the motion court that Takasha was merely making up her story in the hope of securing a new trial for appellant. Because her testimony at the

---

**2.** In his brief, appellant refers to three different persons, Takasha Cross, Tasha Cross, and Keesha Cross, as alibi witnesses who would have testified that appellant was with her on the night in question. From references in the transcript, we understand Keesha to be a nickname for Takasha Cross. We find no reference to a Tasha other than in appellant's brief. We therefore assume this to be either another nickname for Takasha or merely a typographical error. We will refer to the witness as Takasha Cross, the name she gave in the evidentiary hearing.

evidentiary hearing was not believable, it could not have provided appellant a feasible defense. We cannot find counsel ineffective for failing to call a witness with such unbelievable claims.

In addition, appellant's counsel could not reasonably have been expected to unearth this witness. Counsel was not given a last name, address, or indication of what Takasha's testimony would concern. We cannot find defense counsel was ineffective for failing to call witnesses of which she was unaware. *See Sloan v. State*, 779 S.W.2d 580, 582 (Mo. banc 1989). Amazingly, even up until the time of the sentencing hearing, appellant did not seem to find Takasha's testimony to be that significant. He gave the names of only two witnesses his counsel was remiss in failing to call, neither of them being Takasha. In view of the above, counsel was not ineffective in failing to call Takasha Cross as a witness. Point denied.

We also find appellant's counsel was not remiss in failing to call Michael Stewart, appellant's brother, to testify. Appellant claimed that Michael could have reinforced his and Anthony Cooper's trial testimony that appellant spent the evening of the murder at Takasha Cross's home. However, Michael failed to show up at court until after appellant had testified. Appellant's counsel, noting that Michael had previously made statements contradicting appellant's trial testimony on several key facts, elected not to call him. These contradictions became abundantly clear when Michael testified at the evidentiary hearing: 1) Michael testified that on the evening of the murder, he picked up appellant at 7:30 p.m. Michael was sure of the time because he was wearing a watch. The two drove around Blumeyer Housing Project for awhile, then went to Barnes Hospital to visit a friend. Later Michael dropped appellant off at Takasha Cross's home. Appellant, however, testified he *arrived* at Takasha's home at 7:30 p.m.; 2) Appellant testified at trial that he had just left the company of Anthony Cooper when Michael picked him up. Michael, however, testified that he and appellant had driven around searching for Anthony Cooper; 3) Appellant testified at

trial that he and Michael went to Barnes Hospital to visit a friend, but they were told by a member of the staff that the friend was no longer there. However, Michael testified they were turned away at the door by a security guard who said visiting hours were over. In light of Michael's contradictory statements, counsel determined it was not proper strategy to call Michael Stewart to testify. Matters of trial strategy are not cognizable in postconviction relief hearings. *Hadley v. State*, 791 S.W.2d 450, 452 (Mo.App., E.D.1990). Point denied.

Appellant next claims Rorie Watkins would have testified that he saw three persons, none of which was appellant, fleeing the scene after the shooting. Watkins claimed to have seen a news report on television announcing that the security officer had been found shot in Laclede Town. He then ran, took a bus, and ran some more, until he got to Laclede Town where he hid under a car just in time to see three persons, none of whom was appellant, loading rifles in a car. The motion court found this testimony clearly not believable. The credibility of witnesses is a matter for the motion court to determine in a postconviction relief hearing. *Garrett v. State*, 814 S.W.2d 325, 327 (Mo.App., S.D.1991). We cannot find the motion court erred in its assessment.

In addition, we agree with the motion court that appellant failed to establish he ever brought this witness to the attention of counsel. Counsel had no notes that appellant had informed her of the existence of Watkins. In fact, appellant never suggested Watkins as a potential witness until the filing of his motion for postconviction relief. Point denied.

Next, appellant argues Gary Bell would have testified that Robert Rice, who was staying with Bell, confessed it was he, along with Christopher Harper and Kenneth Dotson, who ambushed Sansoucie. However, again, appellant never mentioned this witness until his postconviction relief motion and defense counsel had no records indicating appellant had brought Bell to her attention.

In addition, Bell's answers to questions by the Court as to why he failed to come forward previously are hardly satisfying.

Q. Now this man made a statement, admitted that he was part of a group of three persons that killed the security guard; why didn't you go to the police with that?

A. I don't know.

Q. What do you mean you don't know?

A. (no response)

Q. You said you heard over the news of the shooting, that's when you first heard it, right?

A. Right.

Q. And then here just days later a man tells you who the other—who two of the other people are and admits he participated, so you had information about three individuals that had committed a murder. Why didn't you go to the police with it?

A. I don't know.

Q. What do you mean you don't know?

A. I don't know.

Because appellant's counsel was not made aware of his testimony, and because Bell's testimony was not believable, counsel was not ineffective for failing to secure the testimony of Rory Watkins. Point denied.

Appellant next claims Dee Sykes would have testified that her boyfriend, Christopher Harper, confessed to her that he and two others, not appellant, shot the security guard. At the evidentiary hearing, appellant's counsel, Ms. DiTraglia, testified that Sykes had given her conflicting statements. DiTraglia testified:

My investigator talked to Dee Sykes. She was the girlfriend of Christopher Harper who had testified for the State. Part of the picture that I was trying to create for the jury was that Christopher, who was running from the police immedi-

ately after the shooting, may have been involved in the shooting. Dee Sykes told my investigator that Chris had arrived at her house between the hours of 8 or 9 p.m., which would have allowed Chris, under the State's case, to have gone to the K–Mart with Curtis to buy bullets. So at that point I didn't want to use her. Then I spoke to her later and she said that Chris came by her house late afternoon while it was still light and never left. So then that—you know, at that point she might have been helpful because if Chris was at her house he couldn't have gone to K–Mart and, therefore, he wouldn't know if Curtis went to K–Mart or not, but because I was trying to make it look like Chris had been involved in the shooting and because she had given me these contradictary (sic) statements I really didn't trust her to be a good witness.

Ms. DiTraglia's decision not to call this witness was clearly a part of her trial strategy, and thus will not be considered for postconviction relief. *Hadley v. State*, 791 S.W.2d at 452. Counsel simply could not know which version of Dee Sykes' account, if either, was really true.[3] Point denied.

▮▮▮ In support of his contention that the above persons were credible witnesses, appellant attempts to offer a partial transcript from the trial of appellant's co-defendant containing the testimony of some of these individuals. We deny appellant's motion to file such transcripts for review in this case. Witness credibility is a matter for the motion court to determine in a postconviction relief hearing. *Garrett*, 814 S.W.2d at 327.[4] Our review is limited to a determination of whether the motion court's findings are clearly erroneous. *Id.*, at 326. We will not allow attempts of appellant to bolster the credibility of his

3. Additionally, we note that under Missouri Supreme Court Rules, a lawyer is under a duty to avoid offering evidence she knows to be false. Mo.Sup.Ct.R. 3.3(a)(4). An attorney may also refuse to offer evidence she reasonably believes to be false. Mo.Sup.Ct.R. 3.3(c). We find Ms. Ditraglia's concern that Dee Sykes might testify

falsely entirely justified and supportive of her decision not to call Sykes as an alibi witness.

4. We note this case discusses a postconviction relief motion based on Rule 27.26, the predecessor of the current Rule 29.15.

purported alibi witnesses with matters not before the motion court. Point denied.

Finally, appellant contends the trial court erred by defining "reasonable doubt" as being "firmly convinced of the defendant's guilt." This argument has been rejected by every Missouri appellate court, and we decline to accept it now. Point denied. Rule 84.16(b).

The judgment of the trial court is affirmed.

SMITH and STEPHAN, JJ., concur.