**STATE of Missouri,
Plaintiff/Respondent,**

v.

**Gregory G. CHAMBERS,
Defendant/Appellant.**

**No. ED 87196.**

Missouri Court of Appeals,
Eastern District,
Division Five.

July 17, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 4, 2007.

Application for Transfer Denied
Oct. 30, 2007.

---

1. All statutory references are to RSMo 2000.

Edward Scott Thompson, Alexandra Johnson, co-counsel, St. Louis, MO, for appellant.

Shaun J. Mackelprang, Roger Johnson, co-counsel, Jefferson City, MO, for respondent.

BOOKER T. SHAW, Presiding Judge.

Defendant Gregory G. Chambers ("Chambers") appeals from the trial court's judgment on his conviction by a jury of one count of robbery in the first degree, Section 569.020, RSMo 2000, one count of attempted robbery in the first degree, Section 564.011, RSMo 2000, and two counts of armed criminal action, Section 571.015, RSMo 2000. Chambers was sentenced to two terms of twelve years' imprisonment for the first degree robbery and attempted first degree robbery counts, and two terms of three years' imprisonment for the armed criminal action counts, all terms to run concurrently.

On appeal, Chambers argues the trial court: (1) abused its discretion in denying his pre-trial motion to sever the charges and trial of certain counts because those counts were improperly joined; (2) abused its discretion in sustaining the State's objection denying Chambers the opportunity to voir dire the venirepanel regarding his alleged mental disease or defect; (3) abused its discretion in prohibiting any testimony on his mental state at the time of the offenses; (4) abused its discretion in overruling his motion to suppress complaining witnesses' in-court and pre-trial identifications of him and in admitting these identifications at trial; (5) clearly erred in granting the State's reverse-*Batson* motion challenging his removal of Venireperson Lowry; and (6) clearly erred in overruling his objections to the State's use of peremptory strikes to remove Venirepersons Fluellen, Bailey, and Martin, all African–Americans, from the venirepanel. We affirm.

### Background

Reviewing the evidence in the light most favorable to the verdict, the following evidence was adduced at trial: On January 30, 2001, shortly after midnight, Robert Schroff ("Schroff") and Curtis Leist ("Leist") were robbed at gun point while walking back to their hotel on Laclede's Landing. When the robber approached Schroff and Leist on foot, Leist was grabbed by his right shoulder, by the collar of his jacket, and shoved into a fence. The robber placed a gun to Leist's head and demanded his wallet. Leist informed the robber that he did not have any money. Next, the robber pointed the gun at Schroff and demanded his wallet. Schroff, looking directly in the robber's face, gave the robber his wallet.

The robber again turned to Leist and demanded his wallet. Leist then gave the robber his wallet. When the robber found no money in the wallet, he began to search through Leist's pockets. When the robber found no money in Leist's pockets, he ran

away. Schroff and Leist called the police. When the police arrived, Leist could not provide them with a description of the robber because of the way he was positioned during the robbery. Schroff, however, was able to provide the police with a description and picked Chambers out of a physical line-up.

On February 2, 2001, Christopher Mautz ("Mautz") was robbed on Laclede's Landing after leaving a bar. The robber came up behind Mautz, put him in a hold with his arms raised over his head and demanded his wallet. Mautz lost his balance and fell forward. When he fell forward, he saw a dark object in front of him, and a white flash went off. Mautz was hit in the upper lip with the recoil of the gun and fell unconscious. When Mautz regained consciousness, he saw the robber in his vehicle laughing and smiling at him and then drive away. Mautz's wallet was also stolen. From his recollection of the events, Mautz gave the police a description of the robber. He also specifically identified Chambers from a photographic line-up and a physical line-up.

Chambers was charged with three counts of first degree robbery and three counts of armed criminal action for the robberies that took place on January 30, 2001 and February 2, 2001. Before trial, Chambers filed a motion to suppress the identification testimony of the State's witnesses. However, during trial, Chambers only objected to Schroff's pre-trial identification of him in a physical line-up and Mautz's pre-trial identification of him in a photo line-up. Chambers did not object to Schroff's or Mautz's in-court identifications. Nor did he object to Mautz's pre-trial identification of him in a physical line-up.

During voir dire, Chambers sought to question the venirepanel regarding the issue of mental disease or defect, but the court deemed the questioning irrelevant to the issues in the case, and only allowed questions regarding Chambers's homelessness. The State made an oral motion in limine to exclude questioning and testimony regarding Chambers's alleged mental defect or disease, and the court granted that motion. During trial, Chambers did not seek to introduce evidence of his mental state. Chambers only mentioned Fulton State Hospital when he was asked about his arrest in 2001. He testified that he could not get his clothes from the arrest because he was at Fulton State Hospital.

■ At the close of voir dire, both parties made their peremptory strikes. The State made seven peremptory strikes, six from the main panel and one from the panel of alternates. Six of these seven strikes were of African–Americans. Chambers challenged the strikes based on *Batson*, and the prosecutor responded with a reverse-*Batson* challenge.[1] The trial court granted one of the prosecutor's reverse-*Batson* challenges, allowing Venireperson Lowry to sit on the panel, but overruled all of Chambers's *Batson* challenges, removing Venirepersons Fluellen, Bailey and Martin from the panel.

At the close of trial, Chambers was convicted of one count of robbery in the first degree, pursuant to Section 569.020, RSMo 2000, for the robbery of Schroff; one count of attempted robbery in the first degree, pursuant to Section 564.011, RSMo 2000, for the attempted robbery of Leist; and two counts of armed criminal action, pursuant to Section 571.015, RSMo 2000, for the gun used in the robbery and attempted

---

**1.** Reverse-*Batson* challenges are challenges the State makes in response to a defendant's "purposeful discrimination on the grounds of race in the exercise of peremptory [strikes]." *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

robbery of Schroff and Leist. A mistrial was declared with regard to the Mautz robbery. Chambers was sentenced to two terms of twelve years' imprisonment for the first degree robbery and attempted first degree robbery counts, and two terms of three years' imprisonment for the armed criminal action counts, all terms to run concurrently.

### Analysis

In his first point on appeal, Chambers argues the trial court abused its discretion in denying his pre-trial motion to sever the charges and trial of Counts I–IV[2] from Counts V and VI[3] because the counts were improperly joined. Specifically, Chambers argues the charges were (a) not of the same or similar character, (b) not part of the same transaction, and (c) not connected or part of a common scheme or plan. Chambers also argues that he was substantially prejudiced by the jury's consideration of evidence of one robbery as evidence of guilt on the other robbery. Finally, Chambers argues he was prejudiced by the trial court's failure to sever the counts because this improperly limited his defense on each individual charge.

Appellate review of a claim for failure to sever charges involves a two-step analysis. *State v. Kelly*, 956 S.W.2d 922, 925 (Mo.App. W.D.1997). "First, [we] must determine whether the initial joinder of the offenses was proper." *Id.* If joinder was proper, we must then determine whether the trial court abused its discretion in refusing to sever the offenses. *Id.*

"Joinder addresses the issue of what crimes can be charged in a single proceeding." *State v. Reeder*, 182 S.W.3d 569, 576 (Mo.App. E.D.2005). Severance, however, presupposes proper joinder and leaves the determination of whether prejudice may result if charges are joined together to the trial court's discretion. *Id.* The issue of whether joinder is proper is a question of law, and this Court only examines the State's evidence in making the determination. *State v. Warren*, 141 S.W.3d 478, 486 (Mo.App. E.D.2004).

We first consider whether joinder was proper in this case. Rule 23.05 states:

All offenses that are of the same or similar character or based on two or more acts that are part of the same transaction or on two or more acts or transactions that are connected or that constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts.

Rule 23.05. "Because liberal joinder of criminal charges is favored in the interest of judicial economy, joinder is appropriate when any of these criteria exist." *Reeder*, 182 S.W.3d at 576.

"The tactics used to commit the crimes need not be identical; they only need be of the same or similar character." *Id.* Some of the factors courts consider to determine if a defendant's tactics are similar in character include: (1) similarity in the type of offenses; (2) similarity in the victims' sex and age group; (3) commonality of the location where the offenses took place; and (4) closeness in time between the crimes. *Id.* at 576–77. In *Langston*, this

---

**2.** Chambers was originally charged with Count I, first degree robbery of Schroff, Count II, first degree robbery of Leist, Count III, armed criminal action in committing the crime in Count I, and Count IV, armed criminal action in committing the crime in Count II.

**3.** Chambers was also charged with Count V, first degree robbery of Mautz, and Count VI, armed criminal action in committing the crime in Count V.

Court held joinder was proper where the crimes were committed in the same geographic area, in close proximity of time, where all involved a robbery, where the victim was threatened by a weapon, and where a sexual attack or attempt at or after the robbery was sufficient to put defendant's "signature" on the incidents. *See State v. Langston,* 889 S.W.2d 93, 96 (Mo.App. E.D.1994).

Here, we find the tactics used in the commission of the robberies are of the same or similar character, and are sufficient to put the defendant's signature on the incidents. The robberies occurred downtown on Laclede's Landing, the robberies occurred within three days of one another, all involved a robbery, in each robbery the victim was threatened with a gun, and the robber touched the victims. Although Chambers notes some differences between the offenses, identical tactics are not required. Joinder was therefore proper.

We next consider the trial court's refusal to sever the offenses. "The key question in determining whether severance should be granted is one of prejudice." *State v. Woodson,* 140 S.W.3d 621, 626–27 (Mo.App.S.D.2004). "The defendant must make a particularized showing of substantial prejudice." *Id.* at 627. "There must be both an abuse of discretion and a clear showing of prejudice before a denial of severance can be reversed." *Id.* "In determining whether or not prejudice may result, the trial court should consider, among other things, the number of offenses charged, the complexity of the evidence to be presented, and whether the jury is able to realistically distinguish the evidence and apply the law intelligently to each offense." *Warren,* 141 S.W.3d at 489.

Additionally, the general allegation that the jury would likely consider

evidence of guilt of one charge as evidence of guilt of another charge is not sufficient to show a particularized showing of substantial prejudice. *Id.* at 488–89. Also, a defendant does not present a cause for severance "by reason of the general allegation that defendant may wish to testify on one charge, but not the other." *Id.* at 489.

Moreover, where the evidence relating to each offense is uncomplicated and distinct, and the jury is properly instructed to return separate verdicts for each offense charged, there is no abuse of discretion in refusing to sever the counts. *Id.* The jury's decision to acquit a defendant of one count, while convicting him of the other counts is indicative of the jury's ability to distinguish evidence and apply the law to each count separately. *See Reeder,* 182 S.W.3d at 577. Absent a particularized showing of exactly how the defendant was prejudiced, there can be no finding of an abuse of discretion. *See Langston,* 889 S.W.2d at 96.

Here, Chambers has not pleaded a particularized showing of substantial prejudice resulting from the offenses being tried jointly. He argues that the jury's use of evidence of one robbery as evidence of guilt on the other robbery prejudiced him and limited his defense of each individual charge. However, our courts have held that this general allegation does not meet the mandatory standards of Rule 24.07, which require a particularized showing of substantial prejudice. *See Warren,* 141 S.W.3d at 488–89. There is no reason to believe that the jury could not distinguish between the evidence and the legal principles applicable to each crime. On the contrary, here, the jury found Chambers guilty of the Leist and Schroff robberies, while the jury was unable to reach a verdict with regard to the Mautz robbery. This is indicative of the jury's ability to look at the facts and evidence of each

count and apply the law separately. Thus, the trial court did not abuse its discretion in denying severance of these counts. Point I is denied.

■ In his second point on appeal, Chambers argues the trial court abused its discretion in sustaining the State's objection and denying him the opportunity to voir dire the venirepanel regarding his alleged mental disease or defect, which he argues negates his culpable mental state. Chambers argues that the diminished capacity evidence negating the required culpable mental state is a valid defense, and a proper and complete voir dire of the venirepanel was necessary to determine any bias the jury members had regarding mental health issues.

■ "The purpose of voir dire is to provide both parties the opportunity to participate in the selection of a fair and impartial jury." *State v. Stewart*, 859 S.W.2d 913, 916 (Mo.App. E.D.1993). "[W]hile the trial court may permit parties to inquire whether potential jurors have preconceived notions on the law which will impede their ability to follow instructions on issues which will arise in the case, such decisions are properly left to the discretion of the trial court." *State v. Johnson*, 207 S.W.3d 24, 41 (Mo. banc 2006). "The trial court has discretion over the nature and extent of counsel's questioning." *Stewart*, 859 S.W.2d at 917. We will not disturb the trial court's decision regarding voir dire unless there is a manifest abuse of discretion and a real probability of injury to the defendant. *Id.* "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Johnson*, 207 S.W.3d at 40. Additionally, courts may exclude voir dire questions which are marginally relevant or irrelevant to issues that

are present in the case. *State v. Timmons*, 956 S.W.2d 277, 282 (Mo.App. W.D. 1997). They may exclude questions which are open-ended inquiries into a venire member's beliefs, misstate the law, arguably seek commitments from the venirepanel, or confuse or mislead the venire members. *Id.*

Here, the trial court did not abuse its discretion in denying Chambers the opportunity to voir dire the venirepanel regarding his mental state. Chambers's mental state was not relevant to the issues presented at trial. During voir dire, this was the exchange between Chambers and the court:

> [The Court]: All right, now, with regard to the mental health issue, where he just doesn't have anything to do with his mental health, and it's not relevant, you intend to ask him why were you living in a vacant car?
>
> [Defendant's counsel]: Well, its [sic] more than living in a vacant car.
>
> [The Court]: How is any evidence going to come out that he was suffering from a mental illness?
>
> [Defendant's counsel]: Because I'll ask him why he was doing the things that he was doing. And he was fully aware that he has a mental illness. He's had it for 15 or 16 years, and I don't believe he has to be an expert to testify.
>
> [The Court]: Mr. Steele, when you say why were you doing the things that you were doing, that's a little vague. Are you specifically talking about why were you living in a vacant car?
>
> [Defendant's counsel]: No, it's more than living in a car.
>
> [The Court]: What evidence—
>
> [Defendant's counsel]: My entire defense before we start.

[The Court]: What other fact before besides him living in a vacant car do you intend to ask him about?

[The Court]: He's eating off and around and out of trash cans.

[The Court]: The question of why were you doing that is not relevant, all right, so I'm going to sustain the [S]tate's objection to you trying to inject the issue of mental illness if that's your purpose for asking. You can ask them if they're going to be biased against him because he was—against him just because you expect evidence to show that he was living out of a car. You can ask if they're going to be biased against him just because the evidence you expect would be because he was eating food out of dumpsters or whatever. But that's it. Do you understand why I am overruling, Mr. Bird?

[State]: Everything we were just talking about on voir dire?

[The Court]: That's right.

[Defendant's counsel]: That's fine.

Our review of the record reflects Chambers was allowed to ask venire members about any biases they could have regarding him eating out of dumpsters, being homeless, and living in a car. Chambers did not assert mental illness as a defense at trial, nor did he adduce any evidence regarding it at trial. As such, the issue was not relevant, and allowing voir dire questioning of mental illness could have misled or confused the jury. The trial court did not err in prohibiting Chambers from questioning the venirepanel regarding mental illness. *See Timmons*, 956 S.W.2d at 282. Point II is denied.

■■■ In his third point on appeal, Chambers argues the trial court abused its discretion in prohibiting any testimony of his mental state at the time of the offenses, depriving him of his fundamental right to answer his accusers. Chambers argues that no law requires expert testimony for the admission of evidence of mental disease or defect negating the existence of a required culpable mental state. Specifically, Chambers contends the proposed evidence was relevant and material because it would have negated the mental state required for this offense.

The State argues this point was not properly preserved for our review because it does not identify any ruling of the trial court, as required by Rule 84.04. We agree.

■■■ "The salutary purpose of a motion in limine is to point out to the court and to opposing counsel the anticipated evidence which might be objectionable." *State v. Mickle*, 164 S.W.3d 33, 54–55 (Mo. App. W.D.2005). However, a trial court's ruling on a motion in limine seeking to exclude evidence is considered interlocutory in nature and is subject to change during the trial. *Id.* at 55. "As such, a motion in limine preserves nothing for appeal." *Id.*

■■■ "To preserve the matter for appeal, the proponent of the evidence must attempt to present the excluded evidence at trial, and if an objection to the proposed evidence is raised and sustained, the proponent must then make an offer of proof." *State v. Marshall*, 131 S.W.3d 375, 377 (Mo.App. E.D.2004). "An offer of proof made before trial at a hearing on a motion in limine will not suffice." *Id.* "To preserve the matter for appellate review, the offer of proof must be made during trial." *Id.* Courts strictly apply these principles based on the notion that trial judges should be given an opportunity to reconsider their prior rulings against the backdrop of the evidence actually adduced, and in light of the circumstances that exist when the questioned evidence is actually

proffered. *Mickle,* 164 S.W.3d at 55. "An appellate court has complete discretion on whether to review an unpreserved matter for possible plain error." *Marshall,* 131 S.W.3d at 378.

Here, Chambers never sought to admit evidence at trial regarding his mental state. Chambers only objected to the exclusion of the evidence during pre-trial conferences. The only mention of Chambers's mental state during trial was when his counsel asked him if he had retrieved his clothes after his arrest in 2001. Chambers stated that he could not get his clothes because he was at Fulton State Hospital.

Chambers did not seek to expound on the statement he made about Fulton State Hospital, nor did he make an offer of proof regarding his mental state during trial. It has been established that an offer of proof made before trial at a hearing or a motion in limine will not suffice to preserve the issue for review. The offer of proof must be made at trial. *See State v. Sanchez,* 186 S.W.3d 260, 264 (Mo. banc 2006) (holding that nothing is preserved for review where the defendant failed to make an offer of proof of his mental condition at trial.) The adverse ruling on this point was made on the State's oral motion in limine. Courts have long held that a motion in limine preserves nothing for appeal. *See Mickle,* 164 S.W.3d at 55. Chambers failed to adduce the evidence necessary at trial to preserve this issue for our review and therefore, we do not review it. Point III is denied.

In his fourth point on appeal, Chambers argues the trial court abused its discretion in overruling his motion to suppress the witnesses' in-court and pre-trial identifications of him and in admitting these identifications at trial. Chambers argues that the identifications were the result of an unnecessarily suggestive police procedure in that he was the only individual who appeared in both the photographic line-up and the physical line-up. Chambers argues that the procedure created a substantial risk of misidentification and tainted those identifications and all future identifications.

 "On a motion to suppress evidence, we review the facts and reasonable inferences therefrom in the light most favorable to the trial court's ruling, and disregard all contrary evidence and inferences." *State v. Cooks,* 861 S.W.2d 769, 771 (Mo.App. E.D.1993). We limit our review to see if sufficient evidence existed to sustain the trial court's finding. Id. We will not disturb the trial court's decision to admit or exclude evidence unless there has been an abuse of discretion. *State v. Chilton,* 119 S.W.3d 176, 177–78 (Mo.App.E.D. 2003). "Deference is given to the trial court's superior opportunity to judge the credibility of the witnesses at the motion hearing." *Id.* at 178.

 For this Court to review an issue on appeal, the issue must be properly preserved. *State v. Petty,* 967 S.W.2d 127, 140 (Mo.App. E.D.1998). "The general rule with respect to preservation of error is that an objection stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appellate brief to preserve it." *Id.*

 Where a party presents unpreserved claims of error on appeal, we may only review them for plain error. *Chilton,* 119 S.W.3d at 178. We review to determine if plain error has affected appellant's substantial rights under Rule 30.20. *Id.* "Plain error is error that is so substantial that without correction, manifest injustice or miscarriage of justice will result." *State v. Anthony,* 857 S.W.2d 861, 864 (Mo.App. W.D.1993).

The record before us indicates that Chambers objected to Schroff's pre-trial identification of him in a physical line-up. The record reflects that Chambers objected to Mautz's pre-trial identification of him in a photo line-up. These claims have been properly preserved for appeal and can be reviewed for abuse of discretion. *See Petty*, 967 S.W.2d at 140. However, Chambers failed to object to Schroff's in-court identification of him, Mautz's pre-trial identification of him in a physical line-up, and Mautz's in-court identification of him. Because Chambers failed to object to Mautz's pre-trial identification of him in a physical line-up, and Mautz's and Schroff's in-court identifications of him, these identifications were not properly preserved for appeal, and can only be reviewed for plain error under Rule 30.20. *See Chilton*, 119 S.W.3d at 178.

In determining whether evidence of a pre-trial identification of defendant is admissible, the courts undertake a two-part analysis. *State v. Glover*, 951 S.W.2d 359, 362 (Mo.App. W.D.1997). If the court determines that the procedure is not unduly suggestive, then the court may admit the pre-trial identification and any in-court identification. *Id.* If, however, the court finds that the pre-trial identification procedures were unduly suggestive, the court must proceed to the second step and determine whether the suggestive procedures have so tainted the identification as to lead to a substantial likelihood that the pre-trial identification was not reliable. Id. If so, the pre-trial identification will be excluded. *Id.* Similarly, if the court finds that the suggestive procedures have so affected the witness as to lead to a substantial likelihood that an in-court identification would not be reliable, then no in-court identification will be permitted. *Id.*

A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police. *Id.* Reliability, rather than suggestiveness, is the linchpin in determining the admissibility of the in-court identification or pre-trial identification. *Cooks*, 861 S.W.2d at 772. The key issue in determining whether unduly suggestive pre-trial procedures tainted the identification is whether the witness has an adequate basis for the identification independent of the suggestive procedure. *Glover*, 951 S.W.2d at 363.

Courts consider five factors in determining whether an in-court or pre-trial identification was sufficiently independent: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* However, the defendant must establish the first prong of the test, that the pre-trial procedures were impermissibly suggestive, before a review of the reliability of the identification is necessary or appropriate. *Id.*

Dissimilarity in physical appearance, alone, is insufficient to establish impermissible suggestion. *Cooks*, 861 S.W.2d at 772. In a line-up, it is not required that all distinguishing features of the subjects be obscured. *Id.* If the defendant has some type of inherent physical abnormality or distinctive appearance, no line-up or photo array can be expected to provide subjects reasonably close in appearance. *Id.* "Courts require only reasonable efforts of police investigators to find physically similar participants for a

photographic line-up." *Id.* Because courts normally require only reasonable efforts to find physically similar participants for a photographic line-up, differences in age, weight, height, hairstyle, and other physical characteristics do not compel a finding of impermissible suggestiveness. *Anthony*, 857 S.W.2d at 867. Additionally, initial identification by photograph followed by a lineup identification is not a *per se* violation of a defendant's constitutional rights and does not necessarily require suppression of the eyewitness identification. *State v. Trimble*, 654 S.W.2d 245, 257 (Mo.App. S.D.1983).

Here, the trial court did not abuse its discretion or err, plainly or otherwise, in admitting the identifications of Chambers. There is nothing in the record to suggest any police action which could have made either the photographic identifications or the physical line-up suggestive. Chambers challenges the line-up identification of Mautz because he states he was the only person in the physical line-up whose picture had been among those shown previously to Mautz in a photo line-up. He also argues that he was the only person in the physical line-up of the approximate age that had been described by Mautz. However, it has been established that an initial identification by photograph followed by a lineup identification is not a *per se* violation of a defendant's constitutional rights, and does not necessarily require suppression of the eyewitness identification. *See id.* More is required for the court to suppress the identifications.

Finally, the key issue in determining whether unduly suggestive pre-trial procedures tainted the identifications is whether the witnesses had adequate bases for the identifications independent of the allegedly suggestive procedures. *See Glover*, 951 S.W.2d at 363. Here, Mautz testified at trial that he observed Chambers in his vehicle for a few seconds after he robbed him. He was able to give the police a sketch of his assailant which led to the identification of Chambers. Schroff also had an independent basis for his identification of Chambers. The record indicates that Schroff had the opportunity to view Chambers at the time of the crime, he looked Chambers directly in the face, and he stared at Chambers for approximately two-to-three minutes while he held a gun to Leist's head and robbed him. Therefore, we find neither Mautz's nor Schroff's identifications of Chambers were the result of impermissibly suggestive police procedures.

Because Chambers failed to establish the pre-trial procedures were impermissibly suggestive, our review of the reliability of the identification is neither necessary nor appropriate. *See id.* The trial court did not abuse its discretion or err, plainly or otherwise, in admitting the identifications made of Chambers by Schroff and Mautz. Point IV is denied.

In his fifth point on appeal, Chambers argues the trial court clearly erred in granting the State's reverse-*Batson* motion challenging his removal of Venireperson Lowry. Chambers argues that he properly gave a race-neutral basis for his peremptory strike of Venireperson Lowry, there was a logical connection between the strike and the crime with which he was charged, and the reason given was not pretextual. Chambers concedes that this point was not properly preserved for appellate review as it was not included in his motion for new trial. Therefore, we review this point only for plain error.

On a *Batson* challenge, we give the trial court's determination great deference and will not set it aside unless we find clear error. *State v. Hopkins*, 140 S.W.3d 143, 148 (Mo.App. E.D.2004). When reviewing for clear error, we evaluate the

entire evidence to determine if we are left with a definite and firm conviction that a mistake has been made. *Id.* It is a violation of the Equal Protection Clause for a party to exercise a peremptory strike to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race. *Id.* at 147. The United States Supreme Court held that in a state criminal trial, it is a violation of the Fourteenth Amendment for the prosecution to utilize peremptory strikes in a racially discriminatory fashion. *Id.* at 148.

The Missouri Supreme Court established a three-step procedure for *Batson* challenges. First, the defendant [4] must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the State and identify the cognizable racial group to which the venireperson or persons belong. *Id.* Second, the trial court will require the State to come forward with reasonably specific and clear race-neutral explanation for the strike. *Id.* Third, assuming the prosecutor is able to articulate an acceptable explanation, the defendant will need to show that the State's proffered reason for the strike was merely pretextual and that the strike was racially motivated. *Id.*

In determining pretext, the first factor to be considered is the existence of similarly-situated venirepersons who were not struck. *Id.* at 148–49. This is a crucial factor in determining pretext. Post-hoc justifications are irrelevant at this stage, the focus is on the plausibility of the contemporaneous explanation. *Id.* at 149. The second factor in determining pretext is the degree of logical relevance between the proffered explanation and the case to be tried. *Id.* The third factor to be considered is the attorney's demeanor or state-

ments made during voir dire, as well as the court's past experiences with the attorney. *Id.* The fourth and final factor in determining pretext is the demeanor of the excluded venirepersons. *Id.*

Here, the State satisfies the first step of the three-step procedure in *Batson* for challenging Chambers's peremptory strike of Venireperson Lowry. The prosecutor noted that six of Chambers's strikes were of Caucasian venirepersons, who are a cognizable class. Chambers then satisfied the second step of the *Batson* procedure by stating that his reason for striking Venireperson Lowry was because Lowry had two nephews who were either police officers or sheriffs in Franklin County.

■■■ We must now determine whether or not defense counsel's explanation for the strike was pretextual. First, we must examine the presence of similarly-situated African–American venirepersons who were not struck. We find there was a similarly-situated African–American venireperson whom Chambers did not strike. Venireperson Ford testified that she had a son who is a deputy sheriff, a son who is a police officer at the airport, another son who is a police officer for the city, and a son-in-law who is a state trooper. Chambers stated that he did not strike Venireperson Ford because she indicated that she was the director of a neighborhood program. However, just as Venireperson Lowry had connections to police officers, Venireperson Ford also had connections with police officers. Venireperson Ford's connections to police officers were just as strong as those of Venireperson Lowry. The explanation given by Chambers for striking Venireperson Lowry does not coincide with his reasons for not striking a

4. In a reverse-*Batson* challenge, such as this case, however, the State was the party that raised the initial *Batson* challenge against

Chambers's peremptory strike of Venireperson Lowry.

similarly-situated African–American venireperson.

Additionally, examining the second factor used for determining pretext, whether or not there is logical relevance between the proffered explanation and the case to be tried, we are unable to find any logical connection between Chambers's explanation for not striking Venireperson Ford and the case at hand. This is particularly true because Venireperson Ford, who was to sit as a juror and make a determination of whether or not Chambers should be convicted of armed robbery, was once a victim of an armed robbery.

In reviewing the third factor for determining pretext, which is the attorney's demeanor or statements made during voir dire, as well as the court's past experiences with the attorney, we find there is nothing in the record to suggest defense counsel acted inappropriately, and the record is devoid of any references to the trial court's prior experiences with defense counsel.

Finally, with regard to the fourth factor used to determine pretext, the demeanor of the excluded venirepersons, we find there is nothing in the record to suggest that Venireperson Lowry did not answer defense counsel's questions or acted inappropriately. However, in light of our analysis and conclusions regarding the first two factors discussed above, we find the proffered explanation for peremptorily striking Venireperson Lowry was pretextual, and the trial court did not err in granting the State's reverse-*Batson* motion challenging the removal of Venireperson Lowry. Point V is denied.

In his sixth point on appeal, Chambers argues the trial court clearly erred in overruling his objections to the State's use of peremptory strikes to remove Venirepersons Fluellen, Bailey, and Martin, all African–Americans, from the venire. Chambers argues he challenged the strikes, the venirepersons belonged to an identifiable racial group, and the record showed that the State's proffered reasons for the strikes were merely pretextual and the strikes were racially motivated in that (1) other similarly-situated Caucasian venirepersons were not struck, (2) there was little logical relevance for striking these venirepersons where the crime allegedly committed was a robbery, and (3) the allegedly race-neutral bases for the strikes were pretextual.

As we have already discussed the relevant law above in Point V, it will not be restated here. In this case, we find Chambers satisfied the first step of the three-step procedure in *Batson* for challenging the peremptory strikes of Venirepersons Fluellen, Bailey, and Martin. Chambers noted that six of the seven of the State's strikes were of African–Americans, who are a cognizable class.

The State satisfied the second step of the *Batson* process by stating its reasons for striking Venirepersons Fluellen, Bailey, and Martin. The prosecutor stated he struck Venireperson Fluellen because Chambers approached her and attempted to curry favor with her by saying that he knew her daughter.

The prosecutor stated he struck Venireperson Bailey because she did not give a strong response to the question of whether or not she could make a decision in a case based on the testimony of one witness. The prosecutor stated that Venireperson Bailey's answers to the question did not rise to a level of cause; however, she indicated that she had some equivocation with regard to the one-witness question. Venireperson Bailey also raised her hand at one point and commented about the period of time between the incident in 2001 and the trial in 2005. The prosecutor was

concerned that she would have problems with the fact that Chambers was being identified four years after the initial incident.

The prosecutor stated he struck Venireperson Martin because he has been a corrections officer for the City of St. Louis for ten and one-half years, and in his work, he constantly hears stories from individuals confined on similar crimes. Although Venireperson Martin stated his employment would not affect his ability to serve on the jury, the prosecutor was still concerned that Venireperson Martin's routine interactions with prisoners in his job would influence his decision as a juror.

We must now determine whether or not the State's explanations for these strikes were pretextual. Again, we determine whether the explanations were pretextual by reviewing the four factors set forth in *Batson* and already discussed in Point V above. We will examine each venireperson separately.

 Chambers argues the State struck Venireperson Fluellen because she was African–American and that the State's proffered reason of Chambers trying to curry favor with her was mere pretext. Venireperson Fluellen notified the baliff that Chambers approached her during a recess in voir dire and mentioned to her that he knew her daughter. Chambers was trying to tell Venireperson Fluellen what her daughter's name was, but she could not hear him. The baliff directed her to inform the judge. Subsequently, the trial judge and the prosecutor questioned Venireperson Fluellen about her familiarity with Chambers. Venireperson Fluellen stated she did not know Chambers.

First, in determining pretext, we must examine the presence of similarly-situated jurors. Here, there are no similarly-situated jurors to consider because Venireperson Fluellen was the only person Chambers approached in this manner. It appears from the record that the State did not strike Venireperson Fluellen because she was African–American, but rather, because Chambers approached her and stated that he knew her daughter. *See State v. Miller,* 162 S.W.3d 7, 14 (Mo. App. E.D.2005) ("While parties are free to use 'horse sense' and 'play hunches' in exercising peremptory strikes, so long as the factors they rely on are race-neutral, objective explanations for exercising such strikes against minority venirepersons are the most persuasive.").

Additionally, looking at the second factor, the degree of logical relevance between the proffered explanation and the case to be tried, it was logically relevant for the State to strike Venireperson Fluellen, when it believed Chambers tried to curry favor by stating that he knew Venireperson Fluellen's daughter. Although Venireperson Fluellen stated that she did not know Chambers, the prosecutor stated he did not feel comfortable keeping her on the panel.

Examining the third factor for determining pretext, which is the prosecutor's demeanor or statements made during voir dire, as well as the court's past experiences with the prosecutor, we find there is nothing in the record to suggest the prosecutor acted inappropriately or that the trial court had any prior experiences with this prosecutor.

Finally, with regard to the fourth factor for determining pretext, the demeanor of the excluded venirepersons, we find there is nothing in the record to suggest Venireperson Fluellen acted inappropriately. However, in light of our analysis and conclusion regarding the first two factors discussed above, we find the State's reasoning for striking Venireperson Fluellen was not pretextual and the trial court did not err in

overruling Chambers's *Batson* challenge of Venireperson Fluellen.

Chambers argues that the State struck Venireperson Bailey because she was African–American and its proffered reason for striking her was mere pretext. Looking at the factors for determining pretext, we find the State's proffered reasons were not mere pretext. First, Chambers argues there were several similarly-situated Caucasian venirepersons who gave ambiguous or evasive responses to the prosecutor's one-witness question. However, all of those potential jurors were stricken from the panel during voir dire for other causes.

It is logically relevant that the State would strike Venireperson Bailey due to her equivocal answers to the one-witness question. It is reasonable for the State to conclude that Venireperson Bailey's uncertainty during voir dire would affect the case. This is particularly relevant because there was only one witness who could identify Chambers at each robbery.

Again, we find there is nothing in the record to suggest that the prosecutor acted inappropriately or that the trial court had any prior experiences with this prosecutor.

In examining the demeanor of the venireperson who is the subject of the strike, Venireperson Bailey had a difficult time determining if she could find someone guilty because of the time that had lapsed between the incident and the trial. She was not sure if the victims could identify Chambers after four years had passed. Based on the foregoing reasons, the trial court did not err in overruling Chambers's *Batson* challenge of Venireperson Bailey.

Finally, Chambers argues the State struck Venireperson Martin because he was African–American and the State's explanation of his job being the reason it struck him was mere pretext. The State's proffered reason for striking Venireperson Martin was because he is employed as a corrections officer and deals with people imprisoned for robbery charges on a regular basis.

In examining the first factor for determining pretext, there were no similarly-situated venirepersons. Venireperson Martin was the only venireperson employed as a corrections officer. Addressing the degree of logical relevance between the proffered explanation and the case to be tried, it is logical that the prosecutor believed that Venireperson Martin might be more sympathetic to Chambers because he works with prisoners daily. *See Johnson*, 207 S.W.3d at 37 (finding that striking a venireperson based on their employment is a valid race-neutral reason and that it is logical to believe that a venireperson who works with the Division of Youth Services might make him more sympathetic to the defendant). Venireperson Martin testified that he had worked in this capacity for over ten years and had heard many stories from imprisoned individuals.

And again, we find there is nothing in the record to suggest the prosecutor acted inappropriately or that the trial court had any prior experiences with this prosecutor.

Finally, we find there is nothing in the record to suggest Venireperson Martin did not answer Chambers's questions or acted inappropriately. However, in light of our analysis and conclusion regarding the first two factors discussed above, we find the State's reasoning for striking Venireperson Martin was not pretextual and the trial court did not err in overruling Chambers's *Batson* challenge of Venireperson Martin.

As a result, we find that the trial court did not clearly err in overruling Chambers's objections to the State's use of peremptory strikes to remove Venirepersons Fluellen, Bailey, and Martin from the venirepanel. Point VI is denied.

The trial court's judgment is affirmed.

AFFIRMED.

GLENN A. NORTON and PATRICIA L. COHEN, JJ., concur.