

# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) WD85974 |
| Respondent, | ) |
| v. | ) OPINION FILED: |
| | ) |
| ISSAC JERMALE FISHER, | ) November 26, 2024 |
| | ) |
| Appellant. | ) |
| | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Patrick William Campbell, Judge**

**Before Division Three: Mark D. Pfeiffer, Presiding Judge,**
**Lisa White Hardwick, Judge, and Thomas N. Chapman, Judge**

Following a jury trial in the Circuit Court of Jackson County, Issac Fisher ("Fisher") was convicted of two counts of murder in the first degree, one count of murder in the second degree, three counts of burglary in the first degree, three counts of unlawful use of a weapon, two counts of endangering the welfare of a child in the first degree, and six counts of armed criminal action. Fisher raises seven points on appeal. He argues that the trial court erred in depriving him of his right to a public trial, in denying his motion to sever, in allowing a late endorsement, in admitting evidence, and in overruling his motion for judgment of acquittal based on insufficient evidence. He also argues that the trial

court plainly erred regarding the jury instruction on one of the counts. The judgment is affirmed.

## Background

In the light most favorable to the jury's verdict,[1] the evidence indicated that Fisher entered his mother's residence ("Residence 1") on the morning of October 7, 2018. While inside, Fisher had an argument with A.H., his long-time girlfriend. Fisher then shot A.H. four times, causing her death. After hearing gunshots, Fisher's mother saw Fisher standing near A.H.'s body with a gun in his hand. Fisher then fled in a blue Dodge Caliber. Fisher's mother made a 911 call and reported that her son had shot A.H.

Fisher then proceeded to a second residence ("Residence 2") where his brother and his brother's wife lived with their children. Fisher began banging on the front door of the house, yelling for his brother. When no one responded, Fisher broke down the door. Once inside, Fisher had a brief conversation with his brother. Fisher then grabbed car keys from inside the residence and left in a white Chevy Traverse. After Fisher left, Fisher's brother informed his wife and their children that they all needed to leave the residence. After the family left and found safety, the incident was reported to police.

Fisher then proceeded to a third residence ("Residence 3") where another relative, J.W., resided in a family unit with K.W. and their two small children (Child 1 and Child

---

[1] We view the evidence in the light most favorable to the verdict. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020) (citing *State v. Brand*, 309 S.W.3d 887, 890 n.2 (Mo. App. W.D. 2010)). With the exception of an argument Fisher makes in his seventh point on appeal, Fisher does not challenge the sufficiency of the evidence in support of his convictions.

2).  Upon arriving at Residence 3, Fisher exited the vehicle he was driving and began firing a Romarm Draco pistol ("Draco")[2] into the house.  Fisher then entered the house and continued to fire the Draco.  Fisher also repeatedly fired a .45 caliber handgun after entering the house.  Fisher inflicted twenty-three gunshot wounds to J.W., causing his death.  Fisher also shot K.W. six times and shot Child 2 once at some point during the home invasion.  At one point, Fisher was merely feet away from Child 1 while shooting J.W.  The home invasion left Residence 3 riddled with bullet holes and covered in broken glass and blood.

At 9:45 a.m., Fisher double parked the white Chevy Traverse in the street outside a convenience store.  He then exited the vehicle with a gun in his hand and went into the store and asked for a pack of Newport Smooth cigarettes.  He then grabbed the cigarettes without paying for them and left in the vehicle.

Fisher then proceeded to a fourth residence ("Residence 4"), where J.J., a cousin of Fisher, lived with his fiancé, D.D.  D.D.'s two young daughters were visiting for the weekend, and D.D. had left for the store with her older daughter.  Fisher parked a block away behind Residence 4 and approached from the backyard of the house.  Fisher then

---

[2] Throughout the transcripts, this weapon was referred to at various times as an assault rifle or as a pistol.  This weapon was described as a "7.62 by 39-millimeter Romarm pistol" by the firearm examiner who testified for the State.  The firearm examiner indicated that the weapon, which utilized a 30-round magazine, is commonly referred to as an assault rifle, but is technically a pistol because the weapon is a semi-automatic weapon rather than an automatic weapon and is not designed to be fired from the shoulder.  It appears from the transcripts that Romarm is the brand name of the weapon and that Draco is the model name.  In this opinion, we refer to the weapon as a "Draco" consistent with the majority of the testimony received at trial.

3

invaded the home, firing multiple .45 caliber shots both outside and inside the home. During the home invasion, Fisher shot J.J. seven times. Fisher then fled the scene.

D.D. returned home from the store with her older daughter soon after the attack. D.D. saw a big hole in the window of her house. She saw her younger daughter (who had stayed home to play games with J.J.) covered in blood. At some point, J.J. stumbled out of the house covered in blood. D.D. attempted to stabilize J.J. but J.J. collapsed. J.J. informed D.D. that Fisher was the person who had shot him. At some point, a neighbor had approached J.J. and D.D. and sought to aid J.J. and D.D. Emergency personnel arrived. J.J. was transported to the hospital but did not survive. The home invasion left Residence 4 riddled with bullet holes and covered in broken glass and blood.

Investigations were conducted of all four residences, with ballistic evidence collected from all three homicide scenes. In investigating the burglary at Residence 2, an officer discovered a blue Dodge Caliber that was left with the engine running, parked to the north of the driveway. An identification card belonging to Fisher and a live .45 caliber round were located in the vehicle. The Draco that was used at the homicide scene at Residence 3 was found on the floor at Residence 2 along with a 30-round magazine. These items were visible from the front door. In the kitchen, investigators recovered a 100-round plastic ammunition tray with Fisher's fingerprints on it, a drop of Fisher's blood, and an unfired .45 caliber round.

A pack of Newport Smooth cigarettes was found outside of Residence 4 along with a lighter and a live round. The white Chevy Traverse was found a short distance

4

from Residence 4 with the driver's side window smashed and a spent casing from the .45 caliber gun that had been used in all three homicides. The .45 caliber gun that was used in all three homicides was found four days later in the backyard of a residence in close proximity to Residence 4.

Fisher was arrested later on the night of October 7, 2018. The State eventually charged Fisher with 20 offenses. Two of the offenses were severed prior to trial.

Following a jury trial, Fisher was convicted of two counts of first-degree murder, one count of second-degree murder, three counts of first-degree burglary, three counts of unlawful use of a weapon, two counts of first-degree endangering the welfare of a child, and six counts of armed criminal action. He was acquitted of one count of stealing (regarding the Chevy Traverse that Fisher drove when he left his brother's residence). Fisher was sentenced accordingly.[3]

---

[3] Regarding the offenses committed at Residence 1, Fisher was sentenced to a term of life for the second-degree murder of his girlfriend, A.H., and ten years for armed criminal action. Regarding the offense committed at Residence 2, Fisher was sentenced to five years for burglary. Regarding the offenses committed at Residence 3, Fisher was sentenced to life without parole for the first-degree murder of J.W., twenty years for each count of unlawful use of a weapon (class A felonies), ten years for each count of armed criminal action, seven years for endangering the welfare of a child, and five years for burglary. Regarding the offenses committed at Residence 4, Fisher was sentenced to life without parole for the first-degree murder of his cousin, J.J., ten years for unlawful use of a weapon (class B felony), ten years for each count of armed criminal action, seven years for endangering the welfare of a child, and five years for burglary. The trial court ordered the convictions for offenses committed at Residence 1 to run concurrent with each other but consecutive to the convictions for the offenses committed at the other residences. The trial court ordered the convictions for the offenses committed at Residences 2 and 3 to run concurrent with each other but consecutive to the convictions for the offenses committed at Residence 1 and Residence 4. The trial court ordered the convictions for the offenses committed at Residence 4 to run concurrently with each other but consecutive to the convictions for the offenses committed at the other residences.

Fisher now appeals to this Court.

**Analysis**

Fisher raises seven points on appeal.  In his first point, he argues that the trial court violated his right to a public trial.  In his second point, he argues that the trial court erred in denying his motion to sever Counts I and II.  In his third point, he argues that the trial court erred in allowing a witness to testify for the State.  In his fourth and fifth points, he argues that the trial court erred in admitting photographic exhibits.  In his sixth point, he argues the trial court plainly erred in instructing the jury.  In his seventh point, he argues that there was insufficient evidence in support of his conviction for endangering the welfare of a child in the first degree.  We address these points in turn.

**Point One**

In his first point on appeal, Fisher argues that the trial court erred in placing signs on the doors of the courtroom that instructed that entry and exit into the courtroom were to occur only during breaks in the trial.  Fisher argues that these signs constituted a closure of the courtroom and that his right to a public trial was violated.

At Fisher's trial, the trial court placed signs on the windows of the door to the courtroom.  The signs contained the octagonal symbol of a stop sign and stated:  "STOP. Jury trial in progress.  You may enter/exit only during breaks.  Spectators may be seated in the section of the gallery closest to the windows.  The rest of the courtroom is reserved for jurors only."

On the morning of the second day of trial (following *voir dire* but prior to the

swearing in of the jury),[4] Fisher objected to the sign. Fisher argued that it was a violation

of his constitutional right to a public trial for the trial court to restrict entry to the

courtroom. The trial court indicated that it believed it had a right to prevent the

movement of spectators from becoming a distraction for the jury. The trial court

indicated that people were welcome to enter and leave but that they had to do so in a way

that did not distract the jury.

Prior to the start of the afternoon session on the second day of trial, the trial court

addressed the public:

> There is a note on the courtroom door. You are free to come in here and
> watch the trial but the note on the door says, If you come in, you wait until
> we take a break. I don't want a lot of moving around, going in, going out.
> I know in the morning session we had some folks going out and coming
> back in.
>
> If you come in, have a seat, we'll take a break about every hour and a half
> or so. When we do take breaks, I'm going to have those of you sitting back
> there stay in your seat until the Court releases you. So just stay put and we
> will accommodate Mr. Fisher, and then once we get Mr. Fisher
> accommodated, I'll release you all. Okay? All right.

The afternoon session then began.

Prior to the start of the third day of trial, the trial court indicated that it had a brief

docket that afternoon and announced the schedule for breaks for the day to the public as

well as the process for clearing the courtroom. Fisher pointed out his prior objection and

indicated that, with respect to that prior objection, he wished to make a record that the

---

[4] It appears from the record that *voir dire* proceedings were held in a different room at the
courthouse than the rest of the trial.

court was then changing the break schedule. Fisher argued that there would be no way for the public who planned on coming to the courtroom to know about the changes in the break schedule. Fisher argued that the signs prevented people from looking into the courtroom and that the proceeding was not open to the public.

The trial court then made a record that there were 12 members of the public in the courtroom at the time, and that there were approximately 25 members of the public in the courtroom the day prior. The trial court indicated that there was "a fair amount of talking going on between the citizens." The trial court noted that spectators "clearly had opposing views on how this trial should proceed" and that it had been necessary to have sheriff's deputies brought to the courtroom to monitor things. The trial court indicated that the public was attempting to exit the courtroom all at once and that there was an issue with a witness in the hallway. The trial court indicated that there had been difficulties in releasing the jury to lunch through the shared hallway and that a traffic jam had essentially occurred in the hallway. The trial court noted that this had all occurred while trying to clear the courtroom due to Fisher's indication that he needed to use the restroom and that Fisher ended up relieving himself on the courtroom floor.

The trial court noted that defense counsel was taking issue with the way the trial court was attempting "to control the traffic in and out of the courtroom with people who are saying things to each other inappropriately[.]" The trial court indicated that it was doing its best to ensure that the public did not make comments that could be heard by the jury and that people were not distracting the jury from the evidence in the case. The trial

court also made a record that it had looked into the windows with the signs up and that, although the signs did cover approximately 90% of the window, it was possible to see into the courtroom.

Fisher then pointed out that the signs had been up prior to the events described by the trial court. Fisher argued that the trial court's control of the courtroom does not extend to preventing the public from entering at any time the public wished to enter. Fisher argued that the change in the break schedule made it impossible for someone wishing to attend later in the day from knowing when they could enter.

Following the jury's verdict, Fisher repeated his objection in his motion for a new trial. At the hearing on the motion, Fisher called an investigator employed by the Missouri State Public Defender. The investigator testified that she was requested to attend Fisher's trial by defense counsel and that she took pictures of the signs on the courtroom windows. The investigator testified that she could "not clearly" see past the signs as to what was going on inside the courtroom.

Fisher also called a family friend, who testified that she attended Fisher's trial; that she first came to the courtroom on the first day of trial; that on that day, the signs were present; that she learned from a court clerk that the proceedings that day (which were the *voir dire* proceedings) were taking place in a separate room; that she could not tell what was occurring in the courtroom prior to the clerk providing such information; that she returned the next morning around 8:20 a.m. and was able to enter the courtroom along with other people walking past the sign; that she watched the trial that day; that she left to

use the restroom and came back while court was in session; that she assumed the judge directed people to restrict their movement because there "was just too much traffic moving" and for safety reasons; and that she saw other people going in and out of the courtroom while it was in session.

In response to argument by the defense, the trial court indicated that it had experienced multiple issues clearing the courtroom at breaks including keeping the jurors from seeing Fisher in custody, and that people came and went while the trial was in session and that the trial court did not admonish those people. The trial court denied Fisher's motion for a new trial.

"Whether a defendant's right to a public trial has been violated is a question of law subject to *de novo* review." *State v. Russell*, 656 S.W.3d 265, 274 (Mo. App. W.D. 2022) (citing *State v. Jones*, 530 S.W.3d 525, 530 (Mo. App. E.D. 2017)).

The Sixth and Fourteenth[5] Amendments to the United States Constitution and Article I, section 18(a) of the Missouri Constitution provide criminal defendants with the right to a public trial.[6] The Sixth Amendment right to a pubic trial "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense

---

[5] The Due Process Clause of the Fourteenth Amendment makes the Sixth Amendment applicable to state proceedings. *Presley v. Georgia*, 558 U.S. 209, 211-212 (2010) (*per curiam*).

[6] In this appeal, while asserting that his rights were violated under both the United States Constitution and the Missouri Constitution, Fisher's arguments are focused on the federal right. Consequently, our analysis is focused on the Sixth Amendment right to a public trial rather than the corresponding provision in Missouri's Constitution.

of their responsibility and to the importance of their functions . . . ." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (internal quotations and citation omitted). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id.* (citations omitted).

The right to a public trial is not absolute. *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (*per curiam*). For example, the right to a public trial "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* (quoting *Waller*, 467 U.S. at 45). However, *Waller* indicated that such circumstances would be rare and that a trial court must take special care in balancing competing interests against the right to a public trial. *Waller*, 467 U.S. at 45. *Waller* set forth standards for trial courts to apply before excluding the public from any stage of criminal trials:

> The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48; *Presley*, 558 U.S. at 213-14 (discussing and quoting *Waller*, 467 U.S. at 45, 48).

In this matter, we find no violation of Fisher's right to a public trial. The record indicates that Fisher's trial was publicly held and viewed by numerous members of the public. The concerns underlying and giving purpose to the Sixth Amendment right to a public trial were not abandoned or contravened in this case. The record indicates that the signs had neither the intent nor effect of excluding persons from the courtroom. Unlike

11

the proceedings in *Waller* or *Presley*, the proceedings in this case were not closed proceedings.[7] The record indicates that the trial court expressly informed the viewing public that they were welcome to attend the entirety of the proceedings, and the record indicates that members of the public were present throughout trial. The record is devoid of any indication that any member of the public was excluded from the proceedings.[8] Although Fisher's briefing refers to the signs as a "blanket ban" on entry that were the result of the trial court's intention to exclude people from the courtroom, we find these assertions to be unsupported by the record.

Although we find that the signs did not constitute a violation of Fisher's right to a public trial in this case, we recognize that restrictions on the public may in other circumstances be akin to, or have the effect of, closed proceedings. In this case, we find that the signs did not constitute an exclusion of the public from the proceedings. We do not purport to address circumstances other than those presently before this Court. This case presents the question of whether Fisher's right to a public trial was violated in this case. We find it was not.

---

[7] Because we find the public was not excluded from the proceedings, the standards expressed in *Waller* and *Presley* governing when the public may be excluded from proceedings are not directly applicable.

[8] As a potential independent ground for denying Fisher's first point on appeal, we note that a Missouri court has previously held that a defendant cannot establish that he or she was prejudiced by the closure of a courtroom based on speculation as to whether anyone was actually excluded. *See, e.g., State v. Salazar*, 414 S.W.3d 606, 614-16 (Mo. App. S.D. 2013). *But see Waller*, 467 U.S. at 49 & n.9 (indicating agreement with the proposition that a defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public trial guarantee).

Point one is denied.

## Point Two

In his second point on appeal, Fisher argues that the trial court abused its discretion in failing to sever Counts I and II.

Fisher filed a pretrial Motion for Severance of Offenses that requested "severance of the three murder counts" in the case. The motion argued that the 20 counts could be grouped into separate incidents and that there were significant factual differences between the killings. The motion stated that Fisher "may" have been planning to assert self-defense regarding the murder of A.H. and that he denied any involvement in the deaths of the other victims. The motion argued that Fisher would be prejudiced by allegations that he shot a 4-year-old child at Residence 3. The motion further argued that the case was complex and included 20 charges. The motion requested that the trial court "sever the myriad counts" and "proceed to trial with one murder, and associated charges, at a time." In the alternative, the motion requested a hearing on the motion and oral argument.

In opposition, the State noted that Fisher was charged with committing a string of felonies in the course of approximately one hour and that Fisher was in some manner related to each homicide victim. The State also pointed out that the offenses were connected to each other by the physical evidence recovered from each crime scene, such as a blue Dodge Caliber that was taken from Residence 1 and recovered at Residence 2; a white Chevy Traverse that was taken from Residence 2, was seen fleeing Residence 3,

13

and was recovered at Residence 4; and the matching .45 caliber shell casings recovered from all three homicide scenes that indicated that the same weapon was used in all three homicides. The State then argued that joinder was proper and severance was unwarranted.

At a hearing on the motion, Fisher indicated that the incident that Fisher was "really asking to be severed" was the homicide of A.H. (Counts I and II). Fisher then detailed the differences between the allegations in the 20 counts. Fisher then provided testimony that he intended to testify regarding self-defense to the killing of his girlfriend and that he did not wish to testify regarding the other charged offenses.

In arguing for severance of Counts I and II, Fisher first argued that a four-year-old had been shot and a one-year-old had almost been shot at Residence 3, and that a child was present at Residence 4, but that no children were involved at Residence 1 (the crime scene underlying Counts I and II). Fisher argued that the involvement of children at some of the scenes would inflame the passions of the jury and prevent a fair trial regarding Counts I and II. Second, Fisher argued that there were differences between the scenes because one potential witness (who did not testify at trial) had indicated that there were two assailants at Residence 4. Third, Fisher argued that (though not bound by his assertions regarding his intentions) he intended to testify to self-defense on Counts I and II and that he did not intend to testify regarding the other charges. Fisher argued that his silence as to the other counts would be held against him if Counts I and II were not severed.

14

The trial court denied the motion to sever.

The decision regarding severance pursuant to Rule 24.07 "is left to the sound discretion of the trial court." *State v. Boyd*, 659 S.W.3d 914, 922-23 (Mo. banc 2023) (quoting *State v. Morrow*, 968 S.W.2d 100, 109 (Mo. banc 1998)). "A trial court abuses its discretion if its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 923 (quoting *State v. McKinney*, 314 S.W.3d 339, 342 (Mo. banc 2010)). Arguments considered on appeal are limited to those arguments previously presented to the trial court. *State v. Jones*, 662 S.W.3d 204, 210 (Mo. App. S.D. 2023) (citing *Edwards v. State*, 636 S.W.3d 606, 614 (Mo. App. 2021)).

Rule 24.07 provides that severance is proper only when (1) a party files a written motion requesting severance, (2) the party "makes a particularized showing of substantial prejudice" if severance is not granted, and (3) "the court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense." Rule 24.07; *Boyd*, 659 S.W.3d at 923. "In considering whether severance is required, the court considers the number of offenses joined, the complexity of the evidence, and the likelihood that the jury can distinguish the evidence and apply it, without confusion, to each offense." *Boyd*, 659 S.W.3d at 923 (quoting *McKinney*, 314 S.W.3d at 342). Missouri courts have repeatedly held that, "when the evidence relating to each offense is uncomplicated and distinct, and the jury is properly instructed to return separate verdicts

15

for each offense charged, there is no abuse of discretion in refusing to sever the counts." *Id.* (collecting cases).

"[T]he general allegation that the jury would likely consider evidence of guilt of one charge as evidence of guilt of another charge is not sufficient to show a particularized showing of substantial prejudice." *State v. Chambers*, 234 S.W.3d 501, 509 (Mo. App. E.D. 2007) (citing *State v. Warren*, 141 S.W.3d 478, 488-89 (Mo. App. E.D. 2004)). Similarly, "[t]he mere fact that juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one does not call for severance." *Boyd*, 659 S.W.3d at 923 (quoting *State v. Love*, 293 S.W.3d 471, 477 (Mo. App. E.D. 2009)). "Also, a defendant does not present a cause for severance by reason of the general allegation that defendant may wish to testify on one charge, but not the other." *Chambers*, 234 S.W.3d at 509. (internal quotations omitted).

In this matter, the trial court did not abuse its discretion in denying Fisher's motion to sever. Although there were a significant number of counts and a considerable amount of evidence, the evidence was such that the jury could distinguish between the distinct offenses.[9] Fisher's argument regarding the potential prejudice due to child victims at two

---

[9] The record of the trial supports this conclusion, in that the State presented the evidence chronologically by distinct crime scene. The record further indicates that the jury was indeed able to distinguish between the charges. The jury was instructed to consider each count separately, and the jury acquitted Fisher of the charged offense of stealing. *See Chambers*, 234 S.W.3d at 509 ("The jury's decision to acquit a defendant of one count, while convicting him of the other counts is indicative of the jury's ability to distinguish evidence and apply the law to each count separately.").

of the crime scenes was insufficient to establish substantial prejudice. Similarly, the trial court could determine that Fisher's allegations regarding his wish to testify on some of the charges but not others was insufficient to establish substantial prejudice. The trial court's decision to deny severance on Counts I and II was not "clearly against the logic of the circumstances then before the court and [] so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *See Boyd*, 659 S.W.3d at 923.[10]

Point two is denied.

## Point Three

In his third point on appeal, Fisher argues that the trial court abused its discretion in allowing the late endorsement and testimony of a witness. Fisher argues that he never waived his objection to the testimony of M.B., that the State acted in bad faith, and that Fisher was surprised and disadvantaged by M.B.'s testimony.

At trial, M.B., a forensic specialist, testified at trial over Fisher's objection. M.B. testified that he responded to Freeway Market on October 8, 2018 for the purpose of recovering surveillance footage from the Freeway Market video recording system.[11]

---

[10] The trial court subsequently granted Fisher's request to sever Counts XIX and XX regarding unlawful possession of a firearm.

[11] The surveillance footage was admitted into evidence and played for the jury at trial prior to M.B. testifying. Additionally, it was later stipulated at trial that the owner of Freeway Market granted KCPD access to the store's surveillance system and that investigators made a copy of the video captured by that surveillance system of October 7, 2018. It was further stipulated that the video copied by investigators had not been altered, tampered, or modified.

M.B. testified as to the procedure he used on October 8, 2018 to determine whether the time stamp on the video recording system was accurate. He testified that the time stamp on the Freeway Market video recording system was eleven minutes and eighteen seconds slow.

Prior to the swearing in of the jury, Fisher objected to any testimony by M.B. because M.B. was not previously endorsed. Fisher argued that M.B. was essentially an expert witness and that allowing M.B. to testify would violate Rule 25.03(b), and that exclusion under Rule 25.18 would be the appropriate remedy.

The State informed the trial court that M.B.'s report had been part of discovery that had been provided to the defense over three years prior and that the video evidence had been provided to the defense multiple times. The State indicated that it had been in conversation with the defense regarding stipulations for a couple of months. had provided a potential stipulation to defense counsel two weeks prior, and had repeatedly asked defense counsel of its position regarding the stipulation. The State indicated that defense counsel had responded the day before trial and indicated that Fisher would not be agreeing to the stipulation regarding M.B. The State indicated that it had left M.B. off of the will call list because the State believed it would receive a stipulation.

Defense counsel argued that the State was misrepresenting their communications. Defense counsel indicated that it had been in discussions regarding stipulations but did not believe that the stipulation would include testimony regarding the calibration of the time stamp on the surveillance video. Defense counsel indicated that it did not receive a

18

proposal of the stipulation in writing until one week prior, that the State had attempted to sneak M.B.'s testimony into the stipulation, and that the first time the defense knew anything about M.B. testifying was one week before trial.

Upon questioning by the trial court, defense counsel then admitted that it had received M.B.'s report in March of 2019. Defense counsel argued that it had received a lot of discovery at that time, but that it was not obligated to guess what the State's witnesses would be. Defense counsel indicated that Fisher had no objection to the video being played for the jury, but that he objected to M.B. testifying as to the accuracy of the time stamp on the surveillance video. The trial court denied the defense motion to exclude the testimony of M.B. Fisher renewed his objections at trial and in his motion for new trial.

"A trial court has broad discretion to permit the late endorsement of additional witnesses." *State v. Young*, 687 S.W.3d 50, 53 (Mo. App. E.D. 2024) (quoting *State v. Hutchison*, 957 S.W.2d 757, 763 (Mo. banc 1997)). "Abuse of discretion may only be found when the endorsement causes fundamental unfairness." *Id.* "Fundamental unfairness occurs when the state's failure to disclose results in defendant's 'genuine surprise' and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence." *State v. Chaidez*, 543 S.W.3d 664, 671 (Mo. App. S.D. 2018) (quoting *State v. Thompson*, 985 S.W.2d 779, 785 (Mo. banc 1999)).

> The four factors generally used to determine whether the trial court has abused its discretion in allowing the late endorsement of witnesses are: (1) whether the defendant waived the objection; (2) whether the State intended

19

to surprise the defendant or acted in bad faith; (3) whether the accused was in fact surprised and disadvantaged; and (4) whether the type of testimony given might readily have been contemplated.

*Young*, 687 S.W.3d at 53 (quoting *Hutchison*, 957 S.W. 2d at 763).

In this matter, the trial court found that the report regarding M.B. was provided to the defense more than three years prior. The trial court concluded that the State had not attempted to surprise or conceal or deceive with respect to M.B.'s testimony, and overruled Fisher's objection to M.B.'s testimony.

The trial court's ruling was not an abuse of discretion. There was support in the record for the trial court's findings including that the defense was aware of the contents of M.B.'s report for a significant period of time prior to trial and that the State had been in communications regarding M.B.'s testimony leading up to trial. Fisher did not seek a continuance, but only sought the "drastic remedy" of exclusion. *See State v. Zuroweste*, 570 S.W.3d 51, 61 (Mo. banc 2019); *see also Hutchison*, 957 S.W.2d at 764 ("Failure to seek a continuance leads to the inference that the late endorsement was not damaging to the complaining party."). The trial court was in a better position to assess the intent underlying the State's actions and their effect on Fisher's defense. We do not find the trial court's ruling to be an abuse of its discretion.

Point three is denied.

## Point Four

In his fourth point, Fisher argues that the trial court abused its discretion in admitting Exhibit 302, a photograph of Fisher's face that was taken shortly after his

20

arrest. Fisher argues that the prejudicial effect of the photograph exceeded its probative value. Exhibit 302 showed Fisher's head wrapped in gauze and showed that there were cuts on his head and face.

Fisher objected to Exhibit 302 and claimed that it showed him in a "dazed state" that might "be suggestive" of drug use.[12] Fisher argued that Exhibit 541, which the defense separately admitted, should be used instead. Exhibit 541 was a photograph taken at the same time that showed Fisher with his eyes nearly completely closed. The trial court overruled the objection.

A trial court has broad discretion to admit or exclude evidence in a criminal trial. *State v. Denham*, 686 S.W.3d 357, 371 (Mo. App. W.D. 2024) (citing *State v. Thomas*, 628 S.W.3d 686, 691 (Mo. App. E.D. 2021)). Appellate review is for abuse of discretion. *Id.* "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* An appellate court reviews the trial court's evidentiary ruling for prejudice, not mere

---

[12] Fisher had previously objected to the State's use of the same photograph (then referred to as Exhibit 365) in a demonstrative exhibit during the State's opening. Fisher argued that the photograph made him look "half drugged or half mean" and argued that the defense's alternative photograph should be used. The State argued that it had used the only close up photograph of his face at the time of his arrest that it had in which Fisher was looking at the camera and argued that the defense's alternative photograph did not show Fisher looking at the camera and showed Fisher with his eyes nearly closed. The trial court indicated that it would permit the State to use Exhibit 365 as a demonstrative exhibit. The trial court found the photograph was not unduly prejudicial. The trial court indicated that it did not see the connotation that the defense attached to the photograph and found that the difference between Exhibit 365 and the defense's alternative picture was that "one he's looking at the camera and the other he's not." Fisher failed to preserve any error for appeal regarding the demonstrative exhibit by failing to include any allegations of error regarding the demonstrative exhibit in his motion for new trial.

error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* (internal quotations omitted).

To be admissible, evidence must be logically and legally relevant. *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* (citation omitted). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* at 818 (quoting *State v. Anderson*, 306 S.W.3d 529, 538 (Mo. banc 2010)). "If the prejudice of the logically relevant evidence outweighs its probative value, it should be excluded." *Id.*

In this matter, Exhibit 302 clearly had probative value as it showed Fisher's appearance at the time of his arrest. Given the defense's reliance (as early as opening statement) on a witness account of the suspect's lack of facial hair, appearance, and approximate age, the photograph clearly had logical relevance. The photograph was also logically relevant because it documented cuts and scratches on Fisher's face, given the broken glass that was left throughout two of the homicide scenes earlier that day and the broken glass that filled the driver's compartment of the Chevy Traverse.

The trial court did not find that the potential prejudice of Exhibit 302 exceeded its probative value. The record indicates that the trial court considered and assessed the probative value of Exhibit 302 against the potential prejudicial effect of its admission, as well as the alternative photographs offered by the defense. The trial court's ruling was

22

not "clearly against the logic of the circumstances and [] so unreasonable as to indicate a lack of careful consideration." *See Denham*, 686 S.W.3d at 371. The trial court did not abuse its discretion in admitting Exhibit 302.

Point four is denied.

**Point Five**

In his fifth point on appeal, Fisher argues that the trial court erred in admitting Exhibits 5 and 6, which were both depictions of a small red bag found on a chair in the living room at Residence 1. Fisher argues that the trial court abused its discretion in admitting these photographs because these photographs were evidence of uncharged bad acts by Fisher.

Exhibits 5 and 6 were both photographs of the same bag, which was discovered at the crime scene at Residence 1. Exhibit 5 showed a small bag on a chair. The contents of the bag are unclear from Exhibit 5. Exhibit 6 was a close-up of the bag and its contents. Exhibit 6 depicted a white-gloved hand holding open a small red bag where the bag was located on a chair. The bag appeared to contain a few transparent plastic bags of a green leafy substance and a small transparent plastic bag containing a white powder.

Prior to *voir dire*, defense counsel sought to question the venire panel about drugs through a questionnaire, indicating to the trial court that the case was going to be "loaded with issues about drugs." The State expressed that it did not believe that drugs would be a central theme of the case. The State indicated that there had been a bag of marijuana

23

found at the first homicide scene, but indicated that they were not planning to contend that the murders were drug-related.

During *voir dire*, defense counsel stated to the venire panel that the defense did not ask any questions about drugs in the questionnaire and that there were not any drug counts in the case. Defense counsel then began to state what the evidence might suggest, at which point the State asked to approach the bench. The State requested that the defense not be allowed to refer to any drugs in the toxicology reports of the victims. Defense counsel indicated that testimony would be received that one of the victims was a drug dealer and that police recovered marijuana from his house. The trial court indicated that it would be inclined at trial to allow evidence at the crime scene of the victim's house. The trial court overruled the State's objection. Defense counsel then asked the venire panel a question regarding whether the panel could be affected by their opinions about drugs or their experiences with drugs.

The next day, the State sought to exclude evidence of marijuana found at the crime scenes as well as evidence that one of the victims may have sold marijuana. The trial court denied the State's motion *in limine* regarding evidence of marijuana found at the crime scenes, indicating its belief that the evidence at the crime scene should not be withheld from the jury. The trial court granted the motion *in limine* regarding potential testimony that one of the victims sold marijuana.

The State then sought to clarify whether the trial court's ruling applied also to the marijuana found at Fisher's mother's house. The trial court indicated that its ruling was

the same for the evidence found at the crime scene at Fisher's mother's house (Residence 1).  In Fisher's opening statement, Fisher began by discussing the drugs found at one of the victim's houses and the toxicology report of the victim and indicating that the jurors would draw their own conclusions from such evidence.

During the testimony of a crime scene technician that processed Residence 1, the State sought to introduce photographs of the crime scene.  Fisher objected to Exhibits 5 and 6, arguing that there was no evidence that the red bag depicted belonged to Fisher and that the bag was evidence of uncharged crimes.  The State responded that Fisher had previously and successfully objected to the State's attempts to keep drug evidence found at the crime scenes out of the trial.  The trial court indicated that the evidence was found at the crime scene, such that it would be up to the jury what to do with it.  The trial court indicated that Fisher had already mentioned drugs found at another address in its opening statement and that Fisher could not have it both ways.  The trial court overruled Fisher's objection.[13]

In closing argument, Fisher made arguments regarding the lack of a clear motive for Fisher to have committed the murders.  Fisher then indicated to the jury that he told them at the very beginning of the case that drugs were "underlying all of this[.]" Fisher then argued that the police would have found more hidden drugs at the home of one of

---

[13] The trial court subsequently sustained an objection made by Fisher to the introduction of a photograph of a bag of a green leafy substance that was found in the basement of Residence 1, noting that the basement was too far removed from being part of the crime scene.

the victims if the police had been looking for drugs. Fisher ultimately argued that an unknown drug dealer had committed the homicides of J.W. and J.J.

After Fisher made arguments regarding drugs during his closing argument, the State then pointed out (in its rebuttal argument) that marijuana had also been found at Fisher's mother's house, and then went on to argue that the crimes had not been committed by some mysterious drug dealer.

As with Fisher's fourth point, Fisher's fifth point is reviewed for abuse of discretion. *See Denham*, 686 S.W.3d at 371. "Generally, proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he or she is on trial." *Prince*, 534 S.W.3d at 818 (internal quotations, citation, and brackets omitted). However, evidence which would otherwise be inadmissible may be admissible "if it tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged with commission of the crime on trial." *Id.* (internal quotations and citation omitted). Additionally, "[e]vidence of uncharged crimes that is part of the circumstances or the sequence of events surrounding the offense charged may be admissible to present a complete and coherent picture of the events that transpired." *Id.* (internal quotations and citation omitted).

26

Fisher has failed to establish that the trial court abused its discretion in admitting the photographs of the red bag. The State did not offer photographs of the red bag for a propensity purpose and did not attempt to present testimony tying the drugs to Fisher. Rather, the record indicates that the evidence was offered to accurately portray the scene of the crime and potentially to rebut arguments that would be made by Fisher regarding evidence of drugs found at the other crime scenes. Moreover, Fisher made drugs an issue throughout the case. Accordingly, the trial court did not abuse its discretion in allowing the State to present to the jury a coherent picture of the events that transpired and the evidence recovered at the crime scenes in this case.

Point five is denied.

### Point Six

In his sixth point, Fisher argues that the trial court plainly erred due to a variance between the charging instrument and the verdict director. Fisher argues that he was charged with endangering Child 1 but was convicted of endangering Child 2 (whose initials were the same as Child 1's initials and whose name was very similar to that of Child 1). Fisher agrees that this claim was not preserved for appeal and can only be reviewed for plain error.

"A variance occurs when the conduct described in the charging instrument differs from the conduct described in the jury instructions." *State v. Cruz-Basurto*, 581 S.W.3d 51, 56 (Mo. App. W.D. 2019). "A variance is not fatal, and will not require reversal unless it submits a new and distinct offense from that with which defendant was

27

charged." *State v. Glass*, 136 S.W.3d 496, 520 (Mo. banc 2004) (internal quotations omitted). To warrant reversal, a variance must be material, and the defendant must be prejudiced. *Id.* "Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges." *Id.* (citation omitted).

Generally, appellate courts do not review unpreserved claims of error. *State v. Jackson-Bey*, 690 S.W.3d 181, 186 (Mo. banc 2024) (citing *State v. Brandolese*, 601 S.W.3d 519, 525 (Mo. banc 2020)). However, Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Such review is discretionary. Rule 30.20; *Brandolese*, 601 S.W.3d at 526. Appellate courts will not review for plain error "unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *See Brandolese*, 601 S.W.3d at 526 (internal quotations and citation omitted).

In this matter, Child 1 and Child 2 both lived at the same residence with their parents J.W. and K.W., had the same initials and very similar names, and were both present when their home was invaded. Testimony was received which indicated that Child 1 was one year old and Child 2 was four years old at the time. Child 2 was shot during the attack. Child 1 was in close proximity when J.W. was being shot.

Fisher was charged in Count IX with the class D felony of endangering the welfare of a child in the first degree. The indictment identified the child's identity with the

28

child's initials and date of birth. Based on the date of birth listed on the indictment, Fisher now argues that the indictment identified Child 1. The verdict director for Count IX asked the jury to determine whether Fisher had committed the offense of endangering the welfare of a child in the first degree against Child 2. When asked whether the defense had any objection to the verdict director submitted by the State, defense counsel replied: "None by defense." Additionally, Fisher submitted a converse instruction and an instruction regarding endangering the welfare of a child in the second degree that both asked whether he had committed an offense against Child 2. During closing argument, Fisher's defense against Count IX was that he was not involved in the shootings at Residence 3.

Under these circumstances, no manifest injustice or miscarriage of justice has resulted. We decline to exercise our discretion to review for plain error.

**Point Seven**

In his seventh point, Fisher argues that there was insufficient evidence in support of Fisher's conviction for the class D felony of endangering the welfare of a child in the first degree. Fisher argues that the evidence was insufficient to show that Fisher knew that a child was present when he discharged a firearm at Residence 3.

> When reviewing whether sufficient evidence supports a criminal conviction, this Court gives great deference to the trier of fact. Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. In applying this standard, the Court accepts as true all of the evidence favorable to the state including all favorable

29

inferences drawn from the evidence and disregards all evidence and inferences to the contrary.

*State v. Stover*, 388 S.W.3d 138, 146 (Mo. banc 2012) (internal quotations and citations omitted).

As relevant, the version of section 568.045.1[14] in effect at the time of the conduct underlying Fisher's conviction on Count IX provided: "A person commits the offense of endangering the welfare of a child in the first degree if he or she: (1) Knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years of age[.]"  Section 562.016.3 provides:

A person "acts knowingly", or with knowledge:

(1) With respect to his or her conduct or to attendant circumstances when he or she is aware of the nature of his or her conduct or that those circumstances exist; or

(2) With respect to a result of his or her conduct when he or she is aware that his or her conduct is practically certain to cause that result."[15]

"The State may prove a defendant's knowledge by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident."  *State v. Rinehart*, 383 S.W.3d 95, 103 (Mo. App. W.D. 2012) (quoting *State v. Burrell*, 160 S.W.3d 798, 802

---

[14] Unless otherwise indicated, statutory references are to RSMo 2016, as updated through the 2018 cumulative supplement.

[15] Similarly, Section 556.061(31) provided:
"Knowingly", when used with respect to:
(a) Conduct or attendant circumstances, means a person is aware of the nature of his or her conduct or that those circumstances exist; or
(b) A result of conduct means a person is aware that his or her conduct is practically certain to cause that result.

(Mo. banc 2005)).  "Direct evidence of one's mental state is seldom available and such intent is usually inferred from circumstantial evidence."  *Id.* (internal citations and quotation omitted).  "Even in a circumstantial evidence case, the evidence need not be conclusive of guilt, nor must the evidence exclude every hypothesis of innocence."  *Id.* (citation omitted).

Fisher argues that the evidence was insufficient to establish that he was aware that a child was present in Residence 3.

The evidence was more than sufficient to establish that Fisher knowingly acted in a manner that created a substantial risk to the life, body, or health of a child less than seventeen.  The evidence and favorable inferences to be drawn from it indicated that Fisher was familiar with Residence 3, that Fisher knew the people who lived there and knew that two of them were very young children, that Fisher knew that the house was not very big and that the bedrooms and children's playroom were clustered together, that Fisher invaded the home while firing bullets into it, that Fisher proceeded to fire significantly more bullets once inside the home, that Fisher shot J.W. 23 times, that Fisher shot K.W. six times, that Fisher shot Child 2, and that Fisher shot J.W. in close proximity to Child 1.[16]  A reasonable juror could have concluded that Fisher was aware

---

[16] Additionally, Fisher failed to provide a complete record of the evidence presented at trial regarding Residence 3.  Although Fisher provided four photographic exhibits from the scene at Residence 3 (which Fisher asserts support his arguments), he failed to provide numerous others from the same crime scene.  Rule 81.16(a) provides: "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant. . . ."  It also contains a provision for requesting that another party in custody of such exhibits deposit them.  Rule 81.16(a).  Rule 81.16(d) provides that an appellate court "may"

31

that children were present and found Fisher guilty beyond a reasonable doubt of endangering the welfare of a child in the first degree.

Point seven is denied.

## Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.

---

consider exhibits not timely deposited as immaterial to the issues on appeal. However, in this matter, Fisher is arguing the sufficiency of the evidence of a criminal conviction and is basing part of that argument on the physical characteristics of a crime scene. Yet, Fisher submitted merely a portion of the evidence depicting the physical characteristics of that crime scene. Although these omissions appear to be inconsequential to the denial of his point on appeal, this Court questions how it could ever find the evidence to be insufficient without being able to assess a complete and accurate portrayal of the evidence underlying the challenged conviction.